

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-13-00196-CR
### NO. 02-13-00197-CR

DANIEL HERNANDEZ                                                    APPELLANT

V.

THE STATE OF TEXAS                                                      STATE

----------

FROM THE 367TH DISTRICT COURT OF DENTON COUNTY
TRIAL COURT NOS. F-2012-0920-E, F-2012-0923-E

----------

## OPINION

----------

Appellant Daniel Hernandez appeals his convictions for aggravated assault with a deadly weapon and for unlawful possession of a firearm. The jury assessed punishments of sixty-three years' confinement for each offense, which the trial court set to run concurrently. Appellant attacks the sufficiency of the evidence in the aggravated assault case. Appellate counsel asserted the appeal

in the unlawful possession case was frivolous. Appellant filed a pro se brief asserting it was not. We affirm both judgments.

## Evidence

Indalacio and Guadalupe Quintero were married. They owned a refreshment business, called Nikory's Korn, at 805 McKinney Street in Denton, Texas, in February 2012. They had a portable stand outside on the parking lot with tables and benches set out where customers could sit and eat. From the same parking lot, Francisco San Miguel operated a service whereby he and his brother, Edgar San Miguel, shipped care packages to Mexico. Francisco and Indalacio were friends.[1]

Around 9:00 p.m. on the Friday night of February 3, 2012, Appellant drove through the Nikory's Korn parking lot. Witnesses described Appellant as burning tires and peeling out, causing gravel to fly from his tires. Indalacio testified he was concerned because families were in the parking lot with perhaps as many as fifty to sixty people, including women and children, who "start[ed] running."

Shortly thereafter, Appellant drove through the Nickory's Korn parking lot a second time in the same manner. Indalacio said he asked Appellant, "[W]hat is going on? What's your problem?" Appellant responded by telling Indalacio, "You are going down," after which Indalacio told Appellant to get out of his pickup. Appellant's response was to burn his tires again. Indalacio picked up a tow hitch

---

[1]Indalacio, in his testimony, does not refer to Francisco by name but refers to him, instead, as "my friend."

2

from behind the corn stand and threw it at Appellant's pickup, hitting it on the driver's side door, and then he threw it a second time at Appellant's pickup's back window, shattering it, whereupon Appellant left the parking lot.

The third time Appellant returned, Edgar testified he saw Appellant get out of his pickup with a gun in his hand and walk towards Nikory's Korn. Appellant pointed the gun in the direction of the corn stand and Francisco. Edgar said Appellant never pointed the gun at him or threatened him.[2] Indalacio testified that his twelve-year-old son came running to him, very frightened, and said a man had pointed a gun at him and the "multitude that was there," and that the man had the gun on Indalacio's friend (contextually, Francisco). Indalacio twice said Appellant never pointed the gun at him, but when he heard Appellant had a gun, he was frightened because Appellant had told him he was "going down," so he ran inside his store in the building behind the corn stand.[3] From a window inside the building, Indalacio saw Appellant point the pistol at Francisco and heard Appellant say to Francisco, "You're going down; you're going down." Indalacio said he believed Appellant thought Francisco was Indalacio. "[H]e was

---

[2]The jury acquitted Appellant of the offense of aggravated assault against Edgar.

[3]The responding officer testified that Indalacio had told him the assailant had pointed the gun at him.

3

pointing at them, like looking for me, okay, which one of you is Lupe? He's not asking, but that's what I think he was thinking, to see who it was."[4]

Francisco testified and also expressed confusion over whether Appellant was threatening him or threatening Indalacio. Francisco said he hid behind a Suburban, and then Appellant got in his pickup and left. Guadalupe, Indalacio's wife, said she never saw Appellant point the gun at anyone because she was inside the building. Guadalupe said Appellant never pointed the gun at her or threatened her personally.[5]

About ten minutes later, someone went to the Quinteros' home, which was only about a mile away from Nikory's Korn, and shot up their pickup. Guadalupe said her twelve-year-old daughter told her someone knocked at the door, but her daughter did not answer it, and then her daughter heard something that sounded like fireworks.

Appellant's wife said Appellant came home that night and complained that her daughter's in-laws had ambushed him and damaged his pickup; she said

---

[4]Indalacio's full name was Indalacio Guadalupe Quintero. His wife's name was Guadalupe as well. Francisco referred to Indalacio as Lupe. Edgar knew Indalacio as Guadalupe. To keep the Quinteros straight during the testimony, Indalacio was referred to by his first name, but occasionally the witnesses referred to him as Lupe or Guadalupe.

[5]The State charged Appellant with aggravated assault against Guadalupe as well, but the jury found him guilty of the lesser-included offense of deadly conduct and assessed his punishment at 365 days' confinement in the county jail. Appellant did not appeal that conviction.

4

Appellant thereafter unloaded and then reloaded his gun and left the house. Contextually, Appellant was referring to the Quinteros: Guadalupe's brother and Appellant's wife's daughter were in a relationship.

Indalacio testified that he had seen Appellant before that night when two similar incidents had occurred, one of which involved physical contact, but he did not know Appellant's name. He said he later learned from his brother-in-law that Appellant had been constantly asking about him and wanting to know where he was and when. Indalacio concluded that the incident of February 3 was no coincidence but was "planned to hurt [him]."

## Aggravated Assault with a Deadly Weapon

In a single point, Appellant contends the evidence is insufficient to support his conviction for aggravated assault with a deadly weapon against Indalacio. The State alleged in the indictment that Appellant "intentionally or knowingly threaten[ed] Indalacio Quintero with imminent bodily injury by pointing a firearm at Indalacio Quintero and threatening to shoot Indalacio Quintero, and did then and there during the commission of said assault, use or exhibit a deadly weapon, to-wit: a firearm." As was shown above, the evidence showed Appellant pointed a gun at Francisco and Indalacio's son. Neither is named as a complainant in any of the indictments. All three complainants denied Appellant pointed a gun at them, and the jury acquitted Appellant in one instance and found Appellant guilty of a lesser-included offense in the other. Only as to Indalacio did the jury convict Appellant as charged in the indictment.

5

**Standard of Review**

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Dobbs*, 434 S.W.3d at 170. The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Dobbs*, 434 S.W.3d at 170. Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Instead, we determine whether the necessary inferences are reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the verdict. *Sorrells v. State*, 343 S.W.3d 152, 155 (Tex. Crim. App. 2011); *see Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Dobbs*, 434 S.W.3d at 170.

We measure the sufficiency of the evidence by the elements of the offense as defined by the hypothetically correct jury charge for the case, not the charge actually given. *Byrd v. State*, 336 S.W.3d 242, 246 (Tex. Crim. App. 2011) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)); *see Crabtree v. State*, 389 S.W.3d 820, 824 (Tex. Crim. App. 2012) ("The essential elements of the crime are determined by state law."). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Byrd*, 336 S.W.3d at 246. The law as authorized by the indictment means the statutory elements of the charged offense as modified by the factual details and legal theories contained in the charging instrument. *See Daugherty v. State*, 387 S.W.3d 654, 665 (Tex. Crim. App. 2013); *see also Rabb v. State*, 434 S.W.3d 613, 616 (Tex. Crim. App. 2014) ("When the State pleads a specific element of a penal offense that has statutory alternatives for that element, the sufficiency of the evidence will be measured by the element that was actually pleaded, and not any alternative statutory elements.").

**Discussion**

"[I]t is proper for an indictment to allege the ways an offense may have been committed in the conjunctive, and for those different ways to be charged to the jury in the disjunctive." *Garrett v. State*, 682 S.W.2d 301, 309 (Tex. Crim.

App. 1984), *cert. denied*, 471 U.S. 1009 (1985).[6] Consequently, although the State alleged in the indictment that Appellant "intentionally or knowingly threaten[ed] Indalacio Quintero with imminent bodily injury by pointing a firearm at Indalacio Quintero *and* threatening to shoot Indalacio Quintero," the jury charge properly asked the jury whether Appellant "intentionally or knowingly threaten[ed] Indalacio Quintero with imminent bodily injury by pointing a firearm at Indalacio Quintero *or* threatening to shoot Indalacio Quintero." (Emphasis added.) *See id.* (holding charge was not fundamentally defective when charge provided "by choking or strangling" while indictment alleged "by choking and strangling"); *see also Kitchens v. State*, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991) ("[A]lthough the indictment may allege the differing methods of committing the offense in the conjunctive, it is proper for the jury to be charged in the disjunctive."), *cert. denied*, 504 U.S. 958 (1992). The jury charge in this instance correctly used the disjunctive "or" and not the conjunctive "and."

Where the charge authorizes the jury to convict a defendant on more than one theory in the disjunctive, as it did here, we will uphold the verdict of guilt if the evidence was sufficient on any theory authorized by the jury charge. *Campbell v. State*, 426 S.W.3d 780, 786 (Tex. Crim. App. 2014). Indalacio twice

---

[6]*Garrett* used the "exclusion of reasonable hypotheses" test. *Id.* at 304. The Texas Court of Criminal Appeals later abrogated that construct. *Geesa v. State*, 820 S.W.2d 154, 161 (Tex. Crim. App. 1991), *overruled on other grounds*, *Paulson v. State*, 28 S.W.3d 570, 573 (Tex. Crim. App. 2000) (holding definition of "beyond a reasonable doubt" not required).

denied Appellant pointed the gun at him. We therefore focus on the second manner and means—whether Appellant threatened Indalacio by threatening to shoot him and whether during the commission of the assault he used or exhibited a deadly weapon.

The evidence, which was undisputed, viewed in the light most favorable to the verdict showed: (1) Even before the date of the offense, Appellant and Indalacio had two prior incidents, one of which involved physical contact; (2) upon Appellant's second drive-through in the parking lot outside Nikory's Korn, Indalacio challenged Appellant as to what his problem was; (3) Appellant told Indalacio in response that he, Indalacio, was "going down"; (4) Indalacio damaged the door on Appellant's pickup and broke out its back window; (5) when Appellant returned the third time, other witnesses observed that Appellant exited his pickup and walked toward Nikory's Korn with a gun in his hand; (6) not finding Indalacio at Nikory's Korn, Appellant went to Indalacio's house and shot up his pickup; and (7) Appellant's wife's testimony showed Appellant blamed the Quinteros (Indalacio) for the damage to his own pickup from the trailer hitch. From the evidence, the jury could reasonably have concluded that Appellant went back to Nikory's Korn the third time for the purpose of confronting Indalacio with a gun, but Indalacio, whose son had alerted him that Appellant was on his way and was armed with a gun in his hand, slipped into the building before Appellant located him.

9

When Appellant came upon Francisco and pointed the gun at him, Appellant appeared to have been confused by his inability to locate Indalacio. Indalacio, himself, watched from inside the building and said he believed Appellant "thought [Francisco] was me" but also described Appellant as "pointing at them, like looking for me, okay, which one of you is [Indalacio]?" Appellant's statements, "You're going down, you're going down," were threats that might have been addressed to Francisco, but again, viewing the evidence in the light most favorable to the verdict, the jury could reasonably have inferred that those threats were addressed to Indalacio because Appellant thought Francisco was Indalacio and had previously made the identical threat to Indalacio. Francisco himself expressed confusion over whether Appellant's threats with the gun were directed at him or at Indalacio. The jury could have then concluded that Appellant, not finding Indalacio at Nikory's Korn, then went to Indalacio's home, where he knocked on the door and, when no one answered, resorted to shooting Indalacio's pickup.

Indalacio testified that he felt threatened. He said he learned from his son that Appellant was looking for him, said he saw Appellant with the gun through the window, said he was scared for his life, and, on the stand, cried when he said, "I was scared that [Appellant] could kill me and leave my family by itself. I have worked so hard so that they can . . . do well, and . . . I could lose it all." Edgar also testified that he was scared as he saw Appellant walking toward the corn stand, first holding the gun down and then pointing it toward Francisco and

10

several other customers, and that he thought that "somebody was going to get shot and killed."

The totality of the evidence shows Appellant was hunting Indalacio with a gun and was verbally threatening to take him down in the area of Nickory's Korn, that is, in the location Appellant expected to find him. Indalacio was, in fact, there. Appellant's inability to find Indalicio in the crowd did not change Appellant's conduct. *See Landrian v. State*, 268 S.W.3d 532, 536 (Tex. Crim. App. 2008) (stating that assault by threat is a conduct-oriented offense which focuses upon the act of making a threat, regardless of any result that the threat may cause.); *Olivas v. State*, 203 S.W.3d 341, 347 (Tex. Crim. App. 2006) ("'[A]lthough the question whether the defendant's conduct produced fear in the victim is relevant, the crucial inquiry remains whether the assailant acted in such a manner as would under the circumstances portend an immediate threat of danger to a person of reasonable sensibility.'" (quoting *Anthony v. United States*, 361 A.2d 202, 206 (D.C. 1976))); *see also Montejano v. State*, No. 08-12-00235-CR, 2014 WL 4638911, at *6 (Tex. App.—El Paso 2014, no pet.) (not designated for publication) (holding that "the operative question is whether the defendant's conduct would be perceived as objectively threatening under the circumstances").

Indalacio's hiding, far from disproving the commission of the offense of assault by threat, proved its commission—it showed both the immediacy and the efficacy of Appellant's threat to Indalacio that he was "going down." The dissent

11

suggests that the words Appellant spoke to Indalacio could have meant that Indalacio was going to jail for damaging Appellant's truck with the trailer hitch or that Appellant was going to knock Indalacio down for doing so. But when Appellant first told Indalacio he was "going down," Indalacio had not yet damaged Appellant's truck. It was after the threat that Indalacio threw the trailer hitch at Appellant's truck twice, damaging Appellant's truck's back window as Appellant was leaving the parking lot.

The dissent questions whether a threat of injury to a complainant "may arise solely from the complainant's view of the circumstances and his conclusions as to the intent of the accused." By this, we interpret the dissent as questioning whether testimony of the complainant that a threat occurred, standing alone, could be legally sufficient evidence to establish that the threat was made. We are not aware that corroboration is required to support a complainant's testimony that he or she has been threatened by the accused. Indalacio positively testified, more than once, that Appellant told him he was "going down" before Appellant left the parking lot the second time. A short time later, Indalacio's son ran to him and told him that Appellant had returned and gotten out of his truck and was walking toward Indalacio's corn stand carrying a gun. Indalacio retreated inside the building behind the corn stand with his son to hide from Appellant. Indalacio and other witnesses saw Appellant brandishing the gun and walking toward the corn stand. Indalacio saw Appellant through a window, pointing the gun at his friend and the building, heard him make the

12

threat again and, not finding him, Appellant left and went to Indalacio's house where he shot up his truck. The jury was entitled to accept Indalacio's testimony on the stand as to Appellant's threat as his credibility was within the jury's sole province and there was no contrary evidence.

It was also within the jury's province to resolve any ambiguity or doubt that "You're going down" as meaning that Appellant intended to kill Indalacio (for whatever motive) based on Appellant's own actions in returning with a gun after making that threat and walking toward the corn stand, and the jury was entitled to infer from that conduct that Appellant was, indeed, looking for Indalacio to carry out his threat by shooting Indalacio, thereby taking him down. Indalacio's reaction of going into the building behind the corn stand and hiding himself and his son in fear that Appellant was going to carry out his threat was supported by testimony not only of Indalacio, himself, but also by other witnesses whose testimony the jury was entitled to accept. We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *See Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Dobbs*, 434 S.W.3d at 170.

Indeed, from the record, Appellant's threats and actions were not fantasies or imaginings only in Indalacio's head. Others saw Appellant, were afraid from his actions, and knew who he was. Indalacio's wife and others had called 9-1-1 by the time of Appellant's second drive-through of the parking lot; witnesses were questioned and statements taken by the police detective; and Appellant, who had

13

fled after apparently scaring everyone in the area with his conduct and the gun he was waving around, was captured a short time later hiding in a building not far from the location of the corn stand.

Finally, the dissent argues that there is no evidence of what Appellant intended to accomplish, that is, no evidence that Appellant was hunting Indalacio with a gun in the location in which he expected to find Indalacio. To the contrary, witnesses saw Appellant going toward Nikory's Korn and pointing the gun in the direction of the corn stand. This was the area of Indalacio's business where Indalacio could be expected to be found and where Appellant, himself, had found Indalacio earlier when he made the threat that Indalacio was going down. Indalacio testified that, from inside the building behind the corn stand where he was hiding, he could see out the window that Appellant had the gun and "was headed this way over here . . . ." As to whether Appellant was "hunting" Indalacio, the jury could have credited Indalacio's testimony that there had been two prior incidents involving Appellant and that Indalacio learned later, after the events of that night, that Appellant had been constantly asking about him, where he had been and when, and that the events were not coincidental but planned to hurt him.

"[P]roof of a culpable mental state generally relies on circumstantial evidence." *Dillon v. State*, 574 S.W.2d 92, 94 (Tex. Crim. App. [Panel Op.] 1978); *Varnes v. State*, 63 S.W.3d 824, 833 (Tex. App.-Houston [14th Dist.] 2001, no pet.); *see Lane v. State*, 763 S.W.2d 785, 787 (Tex. Crim. App. 1989)

14

("Establishment of culpable mental states is almost invariably grounded upon inferences to be drawn by the factfinder from the attendant circumstances."). Intent may be determined from a defendant's words, acts, and conduct, and "is a matter of fact, to be determined from all of the circumstances." *Smith v. State*, 965 S.W.2d 509, 518 (Tex. Crim. App.1998).

We hold the evidence was sufficient for a rational trier of fact to have found beyond a reasonable doubt that Appellant intentionally or knowingly threatened Indalacio with imminent bodily injury by threatening to shoot Indalacio and that during the commission of the assault, he used or exhibited a deadly weapon.[7] *See Jackson*, 443 U.S. at 319; *Dobbs*, 434 S.W.3d at 170; *see also Kitchens*, 823 S.W.2d at 258 ("It is appropriate where the alternate theories of committing the same offense are submitted to the jury in the disjunctive for the jury to return a general verdict if the evidence is sufficient to support a finding under any of the theories submitted."). We overrule Appellant's sole point and affirm the judgment in cause number 02-13-00196-CR.

### Unlawful Possession of a Firearm by a Felon

Appellant's court-appointed appellate counsel filed a motion to withdraw as counsel and a brief in support of that motion in related cause number 02-13-00197-CR. Counsel's brief and motion meet the requirements of *Anders v.*

---

[7]Because the evidence is sufficient without the application of a transferred intent, we do not reach that portion of Appellant's brief. *See* Tex. R. App. P. 47.1.

15

*California*, 386 U.S. 738, 87 S. Ct. 1396 (1967), by presenting a professional evaluation of the record showing why there are no arguable grounds for relief. In compliance with *Kelly v. State*, 436 S.W.3d 313, 319 (Tex. Crim. App. 2014), counsel notified Appellant of his motion to withdraw, provided him a copy of the brief, informed him of his right to file a pro se response, informed him of his pro se right to seek discretionary review should this court hold the appeal is frivolous, and took concrete measures to facilitate Appellant's review of the appellate record.

Appellant filed a pro se brief.[8] Appellant asserts the prosecutor relied on perjured testimony and, effectively, there was insufficient evidence to show he used or exhibited a weapon. Appellant also complains about the admission of testimony for which there was no objection and about the effectiveness of trial and appellate counsel.

---

[8]On March 19, 2014, this court by letter instructed the trial court to make the record available to Appellant. On April 23, 2014, Appellant filed a pro se motion to extend time to file his brief in which he complained about not having volume two (voir dire) and volume five (final arguments and verdict) of the reporter's record. This court's April 25, 2014 order granted Appellant's motion to extend time but did not address his complaint regarding the missing portions of the record. In an April 30, 2014 letter to this court, Appellant again complained about not having access to volumes two and five of the reporter's record. It is our understanding that the trial court clerk sent the entire record to Appellant again on or about May 1, 2014. In his July 21, 2014 brief, Appellant does not complain about having an incomplete record.

As a reviewing court, we must conduct an independent evaluation of the record to determine whether counsel is correct in determining that the appeal is frivolous. *See Stafford v. State*, 813 S.W.2d 503, 511 (Tex. Crim. App. 1991); *Mays v. State*, 904 S.W.2d 920, 923 (Tex. App.—Fort Worth 1995, no pet.). Only then may we grant counsel's motion to withdraw. *See Penson v. Ohio*, 488 U.S. 75, 82–83, 109 S. Ct. 351 (1988).

We have carefully reviewed the record, counsel's brief, and Appellant's pro se brief. We agree with counsel that this appeal is wholly frivolous and without merit; we find nothing in the record that arguably might support an appeal. *See Bledsoe v. State*, 178 S.W.3d 824, 827–28 (Tex. Crim. App. 2005). Accordingly, we grant counsel's motion to withdraw and affirm the trial court's judgment in cause number 02-13-00197-CR.

/s/ Anne Gardner
ANNE GARDNER
JUSTICE

PANEL: LIVINGSTON, C.J.; DAUPHINOT and GARDNER, JJ.

DAUPHINOT, J., filed a dissenting opinion.

PUBLISH

DELIVERED: August 6, 2015

17