

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-18-00539-CR

———————————————————

TERRI DONNELL SANDERS, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 97th District Court
Montague County, Texas
Trial Court No. 2018-0201M-CR

---

Before Sudderth, C.J.; Birdwell and Wallach, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

This case arises from a fatal head-on car collision on Highway 82 between Wichita Falls and Nocona on October 23, 2015. Sanders was driving home in her Toyota FJ Cruiser to Nocona after attending a party in Wichita Falls; Brent Michael Winkler, Kyle David Kemp, and Jackson Pennington were driving in Winkler's Dodge Intrepid to Wichita Falls from Nocona. Shortly before midnight, their vehicles violently collided, killing Winkler and Kemp and injuring Pennington. Winkler and Kemp were only 20 years old.

The State concluded that Sanders was at fault and had been driving under the influence of alcohol, drugs, or both and prosecuted her for two counts of intoxication manslaughter, two counts of manslaughter, and a count of aggravated assault with a deadly weapon. The manslaughter charges were enhanced with deadly weapon allegations. Sanders countered the State's allegations of intoxication and reckless driving with a defense that wet road conditions caused the accident.

The jury acquitted Sanders of the intoxication manslaughter charges but found her guilty of two counts of manslaughter, with affirmative deadly-weapon findings, and of aggravated assault with a deadly weapon. It assessed punishments of eight years' confinement for the manslaughter convictions and four years' confinement for the aggravated assault conviction. The trial court sentenced her accordingly.

In nine points, Sanders now appeals her conviction. We affirm.

## Background

### I. The party

On the night of October 23, Sanders's then-boyfriend Clint Mahin picked her up from her workplace in Wichita Falls around 5:30 or 6:00 p.m. and they arrived at her coworker's house for a backyard barbecue around 6:15 p.m. At trial, accounts differed as to how much Sanders had had to drink at the party. Mahin testified at trial that she was not a "party girl" and estimated that she had "[a] couple of beers." One coworker, Breanne Priddy, recalled talking to Sanders and testified that she was holding a cup of something but did not smell of alcohol or seem intoxicated. Coworker Craig McCarthy similarly testified that while he was at the party early on, he saw Sanders pour herself a beer but did not believe she was intoxicated or impaired when he left shortly after Sanders and Mahin arrived.

Gary Mills, on the other hand, testified that he stayed at the party until about 9:00 or 10:00 and that when he spoke to Sanders, "she . . . appeared to be under the influence, just mannerisms and slurred speech." He described her speech as "draggy or slurry." He recalled that she held a red Solo cup, though he acknowledged that he did not know what was in it. Mills also admitted that he had had "probably five to seven" beers at the party.

Mahin denied Sanders had any slurred speech or impairment, and he was not concerned about her driving when they left the party. So, he drove her to her Toyota

3

that she had left at work, and then they both headed back home to Nocona, each driving their own vehicle.

## II. The accident

Robert Moore and his son were driving toward Wichita Falls on Highway 82 on the night of the accident, hauling a U-Haul trailer and driving about 60-70 miles per hour. He and his son were the first people to come upon the accident, and they immediately called 9-1-1. Although it was almost midnight and the road was dark, Moore described the road conditions as "good." He recalled no standing or running water but testified that "if it was damp, it wasn't very wet."

Moore described Sanders as sitting in the driver's seat, with "her eyes . . . wide open and she was just kind of looking." According to Moore, he repeatedly asked her if she was okay, and "she kind of was mumbling and everything." He testified that he "could smell a little alcohol" coming from inside the vehicle.

Mark Murphy, a nearby volunteer firefighter, received the 9-1-1 dispatch at around 11:45 p.m. Murphy testified that he was "[v]ery" familiar with Highway 82 and described the section where the accident took place as a "straight stretch" with some "light rolling hills." Although it had a 75 mile-an-hour speed limit, Murphy explained that a lot of people drove it cautiously to avoid hitting wildlife. As to specific conditions that evening, Murphy testified that he did not remember anything "extraordinary going on that night at all." He recalled that it was humid that night, but he did not have his

4

windshield wipers on because it was not raining. Nor did he remember any standing water on the roadway.

Billy Henley, another volunteer firefighter in Nocona who was dispatched to the scene, provided similar testimony. When asked about the road conditions that night, Henley testified that "[n]othing st[ood] out," and he did not recall anything about the road condition that forced him to drive any slower than usual.

Texas State Trooper Rachel Russell was also dispatched to the scene at about the same time as Murphy. She recalled that the road was wet but not so much as to prevent her from safely driving over the speed limit to get to the scene. Like Murphy, she denied the presence of any rushing or standing water on the road.

When Trooper Russell spoke with Sanders at the scene, she observed that Sanders "had a heavy odor of alcohol on her breath," her eyes were red and bloodshot, and her speech was slurred. Sanders initially denied drinking alcohol, but when Trooper Russell told her that Mahin had said otherwise, she admitted that she had been drinking beer around 6:00 p.m. at a coworker's party.[1] Sanders had "a little bit of blood on her face, but [she] told [Trooper Russell] her airbag had went off, that she was okay." This

---

[1]Trooper Russell's conversations with Sanders and Mahin were recorded on her dashcam. The recording was admitted at trial and played for the jury.

assured Trooper Russell that Sanders was not injured, and so she asked Trooper Brandon Neff to conduct field sobriety tests (FSTs).

Trooper Neff approached Sanders, who by that time was sitting in the backseat of Mahin's pickup truck, and "immediately smelled the odor of an alcoholic beverage coming from her person." He also noticed Appellant's eyes were "glassy and bloodshot," her speech was "slow and slurred[,] and she seemed to have an issue processing [his] questions." Trooper Neff asked Sanders if she was injured, and she replied that she was not and that she was "fine." As Trooper Neff continued to talk with Sanders, she told him that she had gotten off work at about 5:30 p.m. that night, gone to a work event, and left around 11:30 or so to go back to Nocona.

When Trooper Neff asked Sanders to exit the truck in order to conduct FSTs, he noticed that she leaned against the truck and his patrol car and did "[n]ot [walk] very well." He interpreted this as a sign of impairment or possible injury. Mahin thought it was more likely a sign of injury and requested a reevaluation by the EMTs on the scene before Trooper Neff administered FSTs. Though Trooper Neff was skeptical at first, the reevaluation revealed a broken ankle and other injuries, so she was taken to the hospital for treatment. Trooper Neff followed the ambulance, and while Appellant was strapped to a backboard in an emergency room at the hospital, he conducted the horizontal gaze nystagmus (HGN) test. Trooper Neff testified that her eyes displayed "equal tracking" and her pupils were the same size, and that he observed six of the possible six total clues in administering the HGN test. Because he concluded that

6

Appellant was intoxicated, he requested a blood sample, but Sanders refused to consent to a blood draw.

Judging from markings and gouge marks left on the pavement and her observation of the damage to the Toyota and Dodge, Trooper Russell concluded that the crash occurred in the Dodge's westbound lane heading toward Wichita Falls and "[t]he front of the FJ Cruiser, the Toyota, had come and hit the left side of the left front of the Dodge at an angle in which could only be done from the Toyota crossing over the line." Although in her inventory of the Toyota, Trooper Russell found a prescription bottle of Diazepam, a generic of Valium, for Sanders in the front passenger's seat, Trooper Russell acknowledged in her testimony that she did not know if Sanders had taken any Valium on the day of the accident. She concluded from her investigation that Sanders "veered over into the other lane of traffic" due to "[i]mpairment from alcohol and possibly drugs."

## III. The trial

In addition to the above-described testimony, both sides relied upon expert testimony at trial to make their case—accident reconstructionists and experts on law-enforcement recognition of intoxication due to drugs or alcohol.

### A. Accident reconstructionist experts

A couple years after the accident took place, the State hired Jim Evans as an accident-reconstruction expert. Based on his review of the investigation reports, photos of the scene and the vehicles, and data retrieved from the Toyota's computer system,

7

Evans concluded that at the time of impact, Sanders's Toyota was traveling an estimated 55 miles an hour in the far right of the Dodge's lane of travel, causing an almost head-on collision. He concluded that "[Sander's] Toyota crossed over quite a distance and the Dodge had also moved over as opposed to the impact happening square in the Dodge's lane," meaning that Winkler had taken some evasive action to avoid the collision but Sanders had not.

Sanders countered Evans's testimony with her own accident-reconstruction expert, Tim Lovett, who testified to his investigation of the scene not long after the accident took place. Lovett disagreed with Evans's opinion that the collision occurred in the far right of the Dodge's lane. Although he agreed that the Toyota had crossed the centerline into the Dodge's westbound lane, he opined that the Dodge was "very close" to the highway centerline at the time of impact, possibly due to the collection of water on the shoulder. Lovett based his conclusion that rain contributed to the collision on three factors: (1) his opinion that both cars were traveling below the speed limit (he estimated the Dodge was only going 34 miles an hour at the time of impact), (2) a local weather report, which measured 3.07 inches of rainfall in the area that night, and (3) his observation that there were no signs of evasive action taken by either car. Lovett conceded, however, that he could not say to a reasonable degree of scientific certainty that water on the roadway caused the collision, and he acknowledged that "[i]ntoxication and drowsiness could have caused drift into [the] oncoming lane."

8

**B. Drug-recognition-expert reconstructionist and rebuttal**

Lieutenant Mica Lunt of the Plano Police Department testified as a "drug-recognition-expert reconstructionist," based on his training in administering HGN tests. In addition to describing the clues that officers look for in conducting an HGN test, Lieutenant Lunt also explained three "keys" to administering a valid HGN test: (1) the suspect's spine has to be straight, whether standing, seated, or lying down; (2) the suspect's pupils must be equal sizes; and (3) the suspect's eyes must track equally. For example, based on a hypothetical posed by the State, Lieutenant Lunt testified that he would not be concerned about the validity and reliability of an HGN test administered on a suspect with a broken ankle if the suspect was strapped down to a backboard and law enforcement verified that her pupils were equal and tracked equally. He also testified that a condition known as postrotational nystagmus, perhaps caused by a sudden stop of a vehicle or an airbag impact, would not affect an HGN test conducted 15 to 30 minutes after a crash. And he also added that nothing in Sanders' medical records indicated any trauma that he would expect to affect HGN results.

As a "drug-recognition-expert reconstructionist," Lieutenant Lunt analyzed whether Sanders was under the influence of a central-nervous-system depressant at the time of the collision. After reviewing investigation reports, dashcam recordings, photos of the scene, and medical records, and interviewing certain witnesses, Lieutenant Lunt opined that Sanders was intoxicated from a central-nervous-system depressant such as alcohol or another drug, or a combination of the two.

9

To rebut Lieutenant Lunt's testimony, Sanders called Dr. Lance Platt. Dr. Platt testified that it was improper to perform an HGN test on an injured car crash victim on her back in a hospital bed and that Sanders in particular was not a good candidate for an HGN test due to the injuries she had sustained in the crash. He also testified that he'd never heard of a "drug-recognition-expert reconstructionist," or of any program or validation in place for any such process, though he testified that he "guess[ed]" someone could apply the criteria for a drug recognition evaluation to a police report and police videos for assessment purposes.

## Discussion

Sanders brings nine points on appeal, divisible into three categories: (1) in points one through six, she challenges the sufficiency of the evidence supporting her convictions and the deadly-weapon findings, (2) in point seven, she challenges the validity and reliability of Lieutenant Lunt's testimony as a "drug-recognition-expert reconstructionist," and (3) in points eight and nine, she complains of the trial court's admission of evidence of Valium in her car and refusal to admit the evidence of marijuana in the Dodge and in the decedents' systems.

## I. Evidentiary sufficiency

### A. Standard of Review

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S.

10

307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman*, 520 S.W.3d at 622.

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Queeman*, 520 S.W.3d at 622. We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Murray*, 457 S.W.3d at 448–49.

When performing a sufficiency review, we must consider all the evidence admitted at trial, even if it was improperly admitted. *Jenkins*, 493 S.W.3d at 599; *Moff v. State*, 131 S.W.3d 485, 489–90 (Tex. Crim. App. 2004).

## B. Recklessness

Sanders's first three points complain of the sufficiency of the evidence to show that she acted recklessly, proof of which was required in order to support the convictions against Sanders for two counts of manslaughter and one count of aggravated assault. Tex. Penal Code Ann. §§ 19.04(a) (requiring a reckless mental state to prove manslaughter), 22.01(a) (requiring, at a minimum,[2] a reckless state of mind to prove assault), 22.02(a) (incorporating elements of assault in defining aggravated assault).

A person acts "recklessly" when, with respect to circumstances surrounding her conduct or the result of her conduct, she "is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." *Id.* § 6.03(c). The risk must "be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint." *Id.* As the Court of Criminal Appeals has explained, "[A]t the heart of reckless conduct is conscious disregard of the risk created by the actor's conduct." *Williams v. State*, 235 S.W.3d 742, 751 (Tex. Crim. App. 2007) (quoting *Lewis v. State*, 529 S.W.2d 550, 553 (Tex. Crim. App. 1975)).

---

[2]Sanders was initially indicted for "intentionally, knowingly, or recklessly" committing aggravated assault, but at trial the State abandoned the allegations of intentional or knowing conduct.

Proof of a culpable mental state generally relies on circumstantial evidence, which we scrutinize as we do other elements of an offense. *Laster v. State*, 275 S.W.3d 512, 519–20 (Tex. Crim. App. 2009); *Hernandez v. State*, 470 S.W.3d 862, 870 (Tex. App.—Fort Worth 2015, pet. ref'd) (quoting *Dillon v. State*, 574 S.W.2d 92, 94 (Tex. Crim. App. 1978)). A defendant's intent may be determined from her words, acts, and conduct in light of all the circumstances surrounding the offense. *Hernandez*, 470 S.W.3d at 870 (quoting *Smith v. State*, 965 S.W.2d 509, 518 (Tex. Crim. App. 1998)); *see also Atkinson v. State*, 517 S.W.3d 902, 906 (Tex. App.—Corpus Christi-Edinburg 2017, no pet.) ("In determining whether the culpable mental state for a homicide offense was proven, the jury can use its collective common sense and may apply common knowledge and experience."). This includes consideration of events before, during, and after the offense. *Henderson v. State*, 825 S.W.2d 746, 749 (Tex. App.—Houston [14th Dist.] 1992, pet. ref'd). If the record supports conflicting inferences, we "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflict in favor of the prosecution, and must defer to that resolution." *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991).

Without elaborating, Sanders argues in her brief that there was insufficient evidence to show that she was subjectively aware of and consciously disregarded a substantial and unjustifiable risk. Yet, the jury heard evidence not only that Sanders had been drinking alcohol before the accident, but also that she was driving in the wrong lane on Highway 82—a rural, unlit highway—in the middle of the night. The

13

record also showed that Sanders was accustomed to driving Highway 82—she lived in Nocona and commuted on Highway 82 to and from work during the week—and there was no contrary evidence indicating that Sanders could not appreciate the risk of crossing the centerline of Highway 82 in the middle of the night. *See, e.g.*, *Aliff v. State*, 627 S.W.2d 166, 172 (Tex. Crim. App. 1982) ("There is nothing in the evidence presented which indicates that the appellant was unaware of the risk his conduct [of speeding down a highway] created."); *Cooks v. State*, 5 S.W.3d 292, 296 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (holding similarly).

Troopers Russell and Evans both concluded that Sanders's Toyota had not only crossed the highway's centerline but also that it was in the far right of the Dodge's westbound lane when the two collided, almost head-on. Evans provided an in-depth explanation to the jury of his understanding of the collision and Winkler's attempt to escape the oncoming Toyota barreling down upon the Dodge. Even Lovett, Sanders' own accident-reconstruction expert, acknowledged that it "goes without saying" that crossing the centerline at all on a dark, two-lane highway like Highway 82 presents a high risk of causing a fatal collision because "[y]ou're separated by a one-foot wide, double yellow stripe. That's it." It was within the jury's purview to weigh Trooper

14

Russell's, Evans's, and Lovett's testimonies,[3] and we are not in a place to disturb such a determination.

Finally, the jury's acquittal of Sanders of the intoxication manslaughters did not preclude it from considering evidence that she may have been driving under the influence. *See Rubio v. State*, 203 S.W.3d 448, 453 (Tex. App.—El Paso 2006, pet. ref'd) ("The fact that one may legally drive after consuming alcohol does not prevent the State from alleging that the driver was reckless in doing so. Thus, the actions of driving under the influence of alcohol can be used to show a conscious disregard of a substantial risk."). The jury heard evidence that Sanders admitted that she had consumed at least a couple of beers that night at the work party, she failed the HGN test, and she appeared intoxicated, both before and after the accident. The jury could have also considered evidence of Sanders's Valium prescription in the car, the relevance of which we discuss in greater depth below.

Considering the evidence as a whole and in the light most favorable to the jury's verdict, it was sufficient to support the jury's finding that Sanders behaved recklessly when she consciously disregarded the risk of driving in the wrong lane of an unlit rural highway, resulting in a head-on collision with the Dodge that killed two young men and seriously injured a third. *See, e.g.*, *Griffith v. State*, 315 S.W.3d 648, 652 (Tex. App.—

---

[3]Similarly, the jury was free to reject Lovett's testimony attributing the crash to wet road conditions.

Eastland 2010, pet. ref'd) (holding evidence sufficient to uphold manslaughter conviction where defendant chose to drive despite being intoxicated and failed to control van in a safe manner, running over victim); *Ashorali v. State*, Nos. 05-06-01476–78-CR, 2008 WL 726202, at *6 (Tex. App.—Dallas Mar. 19, 2008, pet. ref'd) (not designated for publication) (holding evidence sufficient that appellant recklessly killed other motorist by traveling at excessive speed); *Porter v. State*, 969 S.W.2d 60, 64 (Tex. App.—Austin 1998, pet. ref'd) (holding evidence sufficient to support manslaughter conviction where it was undisputed that accident took place on decedent's side of the road, witnesses observed defendant on the wrong side of the road moments before accident, and evidence indicated driver chose to drive while fatigued and under the influence of controlled substances).

We overrule Sanders's first three points.

## C. Deadly Weapon Findings

In her fourth, fifth, and sixth points, Sanders argues that the evidence is insufficient to support the jury's findings that she used a deadly weapon in committing manslaughter and aggravated assault.

"[A] motor vehicle is not a deadly weapon per se, but can be found to be a deadly weapon if it is used in a manner that is capable of causing death or serious bodily injury." *Couthren v. State*, 571 S.W.3d 786, 789 (Tex. Crim. App. 2019). As the Court of Criminal Appeals explained in *Couthren*, "[W]hen assessing a defendant's manner of driving, we examine whether a defendant's driving was reckless or dangerous." *Id.* at 790. Proof

16

of reckless driving, particularly when it in fact resulted in death or serious bodily injury, is sufficient to support a deadly-weapon finding. *Sierra v. State*, 280 S.W.3d 250, 256 (Tex. Crim. App. 2009) (holding evidence sufficient where victim was pinned in vehicle, convulsing and struggling to breathe, and remained in the hospital for a month after the accident). We have already upheld the jury's findings of Sanders's reckless behavior by driving her car in an unsafe manner, resulting in two deaths and serious injuries to another. Pennington testified that in addition to suffering the loss of two of his best friends, he sustained injuries to his left leg, spine, neck, and torso, and that his joints still popped when he moved. Viewed as a whole and in the light most favorable to the jury's deadly-weapon findings, the evidence was sufficient and we overrule Sanders's fourth, fifth, and sixth points. *See id.*; *Cook v. State*, 328 S.W.3d 95, 100 (Tex. App.—Fort Worth 2010, pet. ref'd) ("Cook's SUV was capable of, and did, in fact, cause Ochoa's death.").

## II. Expert testimony

In her seventh point, Sanders argues that the trial court erred by admitting Lieutenant Lunt's testimony as a "drug-recognition-expert reconstructionist" because it was unreliable "junk science." We will review the trial court's admission of his testimony for an abuse of discretion. *See Coble v. State*, 330 S.W.3d 253, 272 (Tex. Crim. App. 2010).

Trial courts act as true "gatekeepers" when considering the reliability and relevance of expert testimony. *Id.* Rule 702 allows expert testimony when the witness

17

is "qualified as an expert by knowledge, skill, experience, training, or education," and his "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Tex. R. Evid. 702. Such testimony is only admissible if it is relevant, meaning it "tend[s] to make the existence of a fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Vela v. State*, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006); *see also* Tex. R. Evid. 401. These rules therefore require the trial judge to make three separate inquiries before admitting expert testimony:

(1) Qualification (whether the witness qualifies as an expert by reason of his knowledge, skill, experience, training or education);

(2) Reliability (whether the subject matter of the testimony is an appropriate one for expert testimony); and

(3) Relevance (whether admitting the expert testimony will actually assist the factfinder in deciding the case).

*Vela*, 209 S.W.3d at 131. Sanders challenges the reliability of Lieutenant Lunt's testimony, describing the State's effort to prove its reliability as "woefully inadequate." *See Russeau v. State*, 171 S.W.3d 871, 881 (Tex. Crim. App. 2005) ("The proponent of scientific evidence must demonstrate to the trial court, by clear and convincing evidence, that the scientific evidence is reliable."). And while Sanders does not take

issue with Lieutenant Lunt's qualifications as a drug-recognition expert, she challenges his reconstruction of drug-recognition-expert analysis.[4]

In so arguing, Sanders labels drug-recognition analysis as a "hard science" subject to the *Kelly* standards of reliability. *Kelly v. State*, 824 S.W.2d 568 (Tex. Crim. App. 1992). The State, on the other hand, argues that it is a "soft science" subject to the same requirement of reliability but applied with less rigor than to the hard sciences. *See Salinas v. State*, No. 02-18-00060-CR, 2019 WL 1574953, at *8 (Tex. App.—Fort Worth Apr. 11, 2019, pet. ref'd) (mem. op., not designated for publication) (citing *Nenno v. State*, 970 S.W.2d 549, 561 (Tex. Crim. App. 1998), *overruled on other grounds by State v. Terrazas*, 4 S.W.3d 720 (Tex. Crim. App. 1999)). We agree with the State.

"Soft sciences" are social sciences "or fields that are based primarily upon experience and training as opposed to the scientific method." *Nenno*, 970 S.W.2d at 561. The drug-recognition field, which has been recognized as a legitimate field by a number of our sister courts, is an experience- and training-based field. *See Richter v. State*, 482 S.W.3d 288, 297 (Tex. App.—Texarkana 2015, no pet.) (collecting cases from our sister courts in Houston (both districts), Tyler, and Dallas). As Lieutenant Lunt described, a drug-recognition expert

> is a person who has both medical and forensic training to evaluate whether or not a person is, number one, impaired; number two, whether or not that impairment is the result of a medical condition or if it's the result of

---

[4]As she states in her brief, "While Lunt is certified as a DRE, his certification was not shown to extend to the type of reconstruction testimony allowed in this case."

the introduction of some kind of intoxicant; and three, whether or not that person is safe to be operating a motor vehicle.

According to Lieutenant Lunt, a drug-recognition-expert reconstruction is essentially an after-the-fact evaluation of the subject's possible impairment based on a review of the accident reports and the investigating officers' impressions and observations.

In explaining his methodology, Lieutenant Lunt described two drug-recognition-expert matrices that he used to perform the reconstruction, a large and a small one, which use "a cluster of symptoms . . . of clinical impairments, general impairments, and they're divided into the seven drug categories that cause impairment that we're trained to look for." Using the investigation records, Lieutenant Lunt then looked at the symptoms that "align[ed] with those seven categories to assist in making a determination as to how a person may [have been] impaired or what may [have impaired] a person." Because this analysis is rooted in experience and training, as opposed to the rigors of the scientific method, we will apply the less-stringent soft-science requirements of reliability to Lieutenant Lunt's drug-recognition-expert reconstruction in this case. *See Richter*, 482 S.W.3d at 297 (applying the *Nenno* soft-sciences standard to its review of drug-recognition-expert-reconstruction testimony).

Under the soft-science standard of review, the State was required to show that (1) the field of expertise involved was a legitimate one, (2) the subject matter of the testimony was within the scope of that field, and (3) the expert's testimony properly relied upon or utilized the principles involved in that field. *Salinas*, 2019 WL 1574953

20

at *8. This is a "flexible" inquiry that in some cases focuses upon personal knowledge or experience. *Vela*, 209 S.W.3d at 134.

Outside the jury's presence, Lieutenant Lunt testified to his credentials as a drug-recognition expert, detailing his training and certification by the Texas Department of Public Safety and endorsement by the International Association of Chiefs of Police. He anticipated describing for the jury what central-nervous-system depressants are, identifying alcohol and Valium as such depressants, and attesting that the two have an additive effect when combined.

He further testified that drug-recognition experts testify nationwide, that reconstruction is a function that drug-recognition experts perform "on a regular basis across th[e] country," and that he has testified to reconstructions in other cases. He detailed the materials he reviewed for this case: the Texas DPS crash report, offense reports, dashcam video recordings, photos from the accident scene, audio recordings of interviews of Moore and his son, an interview of Mills, and Sanders's medical records. And he described his application of the drug-recognition-expert standards and training to his review of those materials and his application of the matrices to Sanders's documented impairments to form his opinion that Sanders was intoxicated by a central-nervous-system depressant at the time of the collision. He further expanded on his opinion, explaining that crossing the centerline is consistent with such intoxication and that central-nervous-system depressants can cause sleep, drifting, and impaired vision, judgment, and reaction time.

Based on the record before us, we cannot say that the trial court abused its discretion by admitting Lieutenant Lunt's drug-recognition-expert-reconstruction testimony. With regard to the reliability of his testimony, the trial court heard his description of the legitimacy and recognition of drug-recognition-expert reconstructions and their use nationwide, and Lieutenant Lunt described how his anticipated testimony and opinion was within the scope of the drug-recognition field and was based upon the principles of drug recognition. *See Richter*, 482 S.W.3d at 297 (holding that threshold of reliability was met by similar testimony regarding drug-recognition-expert reconstruction). Although Sanders argues that his testimony should not have been allowed because he did not use all of the steps used by a drug-recognition expert when evaluating a subject in person, Lieutenant Lunt explained that as a drug-recognition-expert he was trained in applying his knowledge to the available data. *See id.* at 297, n.7 (holding similarly). For similar reasons, we are unpersuaded by Sanders' argument that his reconstruction was invalid because he did not interview Sanders in person. Experts are not required to base their opinion on first-hand knowledge. *See* Tex. R. Evid. 703 ("An expert may base an opinion on facts or data . . . that the expert has been made aware of, reviewed, *or* personally observed.") (emphasis added).

For these reasons, we overrule Sanders's seventh point.

## III. Evidentiary complaints

In her last two points, Sanders complains of the trial court's admission of the evidence of Valium found in her car and its exclusion of evidence of marijuana and

marijuana paraphernalia found in the Dodge, as well as the presence of marijuana in Winkler's bloodstream. We again review the admission or exclusion of evidence for an abuse of discretion. *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003). So long as the trial court's decision falls within the zone of reasonable disagreement, we will not disturb it on appeal. *Id.*

### A. Valium

In her eighth point, Sanders argues that the discovery of Valium in her Toyota was irrelevant because there was no evidence that she had taken it on the night of the collision.

Evidence is relevant if it has any tendency to make a fact of consequence more or less probable than it would be without the evidence. Tex. R. Evid. 401. The State directs us to *Ouellette v. State* as instructive because it addressed a similar fact pattern. 353 S.W.3d 868 (Tex. Crim. App. 2011). *Ouellette* was a DWI prosecution. An officer at the scene of the car accident testified that the defendant was "acting unusual" and that he smelled alcohol on the defendant's breath, and the defendant admitted drinking a glass of wine earlier that evening. *Id.* at 869. After administering FSTs, officers placed her under arrest for DWI. *Id.* After the arrest, another officer found in the car a pill bottle containing pills subsequently determined to be central-nervous-system depressants and leading the officers to conclude the defendant was intoxicated either by pills, alcohol, or both. *Id.* The defendant argued that the trial court erred by giving in the charge a definition of intoxicated that included drug-intoxication when there was

no evidence that appellant had consumed the drugs. *Id.* In addressing this argument, the Court of Criminal Appeals highlighted the focus of the DWI statute on the *state* of intoxication, not on the intoxicant. *Id.* (citing Tex. Penal Code Ann. § 49.01(2)(A)) (providing one may become legally intoxicated through the ingestion of "any . . . substance into the body"). The court concluded that the trial court did not err because even though the evidence that the defendant was intoxicated by drugs was "circumstantial and not obviously overwhelming," it existed, and there was testimony indicating that the defendant had consumed a central-nervous-system depressant, such as alcohol, pills, or both. *Id.* at 870.

For similar reasons, here the trial court did not err by finding that the evidence of Valium in Sanders's car was relevant. The State's theory at trial was that Sanders was driving under the influence of a central-nervous-system depressant—alcohol, drugs, or both. Multiple witnesses testified to their conclusions that Sanders was driving under such influence, based on their observations of Sanders's behavior and their review of the accident scene. The evidence of the Valium in her car on the night of the accident was therefore relevant as a possible source of the central-nervous system depressant influence. *See id.*

We therefore overrule Sanders's eighth point.

### C. Marijuana

In her ninth point, Sanders argues that the trial court erred by precluding her from introducing evidence that loose marijuana and a marijuana pipe were found in the

Dodge after the accident, that Pennington smelled of marijuana, that both Winkler and Kemp's autopsies revealed the presence of marijuana in their blood, and that marijuana usage can affect reaction times while driving. She argues that the evidence was relevant to and precluded her from presenting her defense that Winkler, the driver of the Dodge, was a concurrent cause of the accident because his alleged "marijuana impairment affected his ability to react and take evasive actions."

The State urges that Sanders did not preserve her point for appeal, and we agree. In the trial court, the marijuana was addressed twice: first, in the context of a pretrial hearing on the State's motion in limine, and again in two offers of proof soliciting testimony regarding the marijuana. In the pretrial hearing, the trial court granted the State's motion in limine requiring a showing of relevance outside the jury's presence before Sanders could present the marijuana evidence. By its very nature as a limine ruling and by the trial court's express statements at the time, this ruling was preliminary and subject to change at trial. Thus, it preserved nothing for appeal. *See Fuller v. State*, 253 S.W.3d 220, 232 (Tex. Crim. App. 2008) ("A motion in limine . . . is a preliminary matter and normally preserves nothing for appellate review. For error to be preserved with regard to the subject of a motion in limine, an objection must be made at the time the subject is raised during trial.").

While Sanders made an offer of proof during trial and outside the jury's presence, she at no time on the record requested that the testimony be admitted, nor did she obtain a ruling on its admission by the trial court. And she did not explain at the time

25

of the offer why the evidence was relevant and admissible. By failing to provide such an explanation and obtain a ruling, Sanders forfeited any error. *See Reyna v. State*, 168 S.W.3d 173, 176 (Tex. Crim. App. 2005) ("[T]o preserve error in the exclusion of evidence, the proponent is required to make an offer of proof *and obtain a ruling.*") (emphasis added); *see also* Tex. R. App. P. 33.1(a)(2)(A) (requiring that the record show the trial court ruled expressly or implicitly on the request, objection, or motion); *Vaughn v. State*, No. 10-17-00158-CR, 2018 WL 6543917, at *2 (Tex. App.—Waco Dec. 12, 2018, pet. ref'd) (mem. op., not designated for publication) ("[I]n order to preserve error, it is necessary that the trial court rule on the objection or offer of proof."). We therefore overrule Sanders's ninth and final point.

## Conclusion

Having overruled each of Sanders's nine points on appeal, we affirm the trial court's judgment.

/s/ Bonnie Sudderth
Bonnie Sudderth
Chief Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: September 3, 2020