## L. F. HILL v. STATE.

No. 24188. December 22, 1948.
Rehearing Denied March 9, 1949.

 ╱

*Murray J. Howze, Monahans,* and *Guy A. McFarland,* Wink, for appellant.

*Ernest S. Goens,* State's Attorney, Austin, for the state.

GRAVES, Judge.

Appellant was convicted of murder and given a penalty of five years in the penitentiary.

Briefly, the facts show that appellant was the proprietor of the Justice Hotel in Wink, Texas, and rented rooms therein; that the deceased and two companions had been indulging in drinking whisky on the afternoon and night of the tragedy; that the deceased, who had a room in another hotel in said town, seemed to have decided to move to appellant's hotel, and had asked to be assigned a room. The deceased and his companions were conducting themselves in a boisterous and noisy manner, and were admonished by appellant to create less noise. Eventually the deceased went into the hotel office and requested to be assigned a room; that he was required to sign the register, which he did, whereupon he was told that guests without bagbage were required to pay in advance. He refused to do so, stating that the construction company for which he worked would pay his bill. He was then informed that such company had made no such agreement with appellant relative to this bill and the cash was again demanded. The deceased became very angry, ran the pen through his name on the register and approached appellant in what he claimed was a threatening manner. About that time another prospective guest came in and the deceased left, saying he was going to get his companions to cancel their reservation and leave this hotel. The new guest registered, was taken upstairs and shown the room for himself and wife. The deceased was then encountered in the hall in front of his companions' room and there the fatal difficuly took place. One of the companions testified that he heard some kind of an argu-

ment in the hall outside the door of their room and eventually heard the deceased ask appellant what room he had and appellant said: "You haven't got a room," and deceased replied: "Are you calling me a liar?" The shooting then started. There were quite a few shots fired. After the shooting stopped, the deceased took a few steps into this room and fell. He died soon thereafter. It seems that a wild shot also burned one of these companions inside the room.

Appellant's version of this final encounter differs from the above and goes into the transaction much more fully. His statement showed that he passed this room of the deceased's companions; that deceased was out in the hall, and he again requested him to be orderly or get out; that deceased replied that he did not have to get out; that he had a room there, to which appellant replied that he did not have such a room and deceased then said: "I guess that makes me out a G-- d--- liar," and struck appellant against a sheet-rock wall and broke the wall; that appellant then stepped back, drew his pistol, and fired two shots over deceased's head, who kept striking appellant, knocking him down. Appellant kept on firing until he had emptied the pistol and then went downstairs and notified the police.

Bill No. 1 complains because of the introduction in evidence of the clothing worn by the deceased at the time he was killed. The trousers were not shown to have any blood on them. A khaki shirt was shown to have had some liquid substance on it, which was congealed and dried out. An undershirt was shown to be in the same condition as when received on the night of the killing except for the congealing of a certain liquid substance thereon. This homicide is alleged to have taken place on August 4, 1947, and the trial is shown to have taken place on March 15, 1948, about seven months after the killing. The testimony is not very conclusive as to the condition of any blood stains. Again, we think some portions of the testimony produced by the use of the clothing of the deceased was beneficial to appellant and to that extent corroborated his defense; that is, the appellant testified that some of the shots fired by him were fired from a prone position and were shown by the entry and exit points in such clothing to have ranged in an upward direction. At the time these articles of clothing were introduced, no testimony relative to the wounds on the body of deceased had been offered, although such was later produced, and we do not think the fact that there were certain spots thereon, evidently blood, was not shown to have been to such a large extent as to have influenced the minds of the jury to ap-

pellant's prejudice. See Trigg v. State, 99 Tex. Cr. R. 376, 296 S. W. 782, wherein it was held as follows:

"The question of blood stains on the garment does not enter into the present case. The coat was originally dark blue, but was old and faded to a purplish color. No blood stains were apparent or visible thereon. This, however, would appear to be immaterial. Whether or not the garment bore blood stains if it was calculated to elucidate any issue in the case, it was properly admitted. The state contended that deceased was standing on the sidewalk doing nothing, and was unaware of appellant's presence, that appellant, with his pistol drawn, came up behind deceased and shot him six times in the back. For this reason the location of the wounds was material to establish the state's theory as to the manner of the killing. To establish the fact that the shots were fired into the back of deceased the coat was admissible. It would be immaterial that the same fact was shown by other evidence. If the state had desired to so proceed the coat might have been identified and offered in evidence as showing shots from the rear before any other witness testified as to the location of wounds on the body of deceased. It would furnish no more ground for objection to this testimony under the facts of the present case than would have been tenable had the state proven by one witness that appellant shot deceased in the back, and then been met with objection when another witness was offered to testify to the same fact."

Again, it is said in Chapa v. State, 149 Tex. Cr. R. 115, 191 S. W. (2d) 729, as follows:

"While it is true that the wounds upon the body, described by the undertaker, tended also to solve that issue and there was no denial thereof from the appellant, such fact would not prevent the State from further establishing its contention by the introduction in evidence of the coat," (citing Trigg v. State, supra).

We do not think appellant was injured by the admission of this clothing.

Bill No. 2 complains of an occasion during the trial wherein the judge presiding "interrupted counsel when no objection was interposed"; that he "indulged in facial expressions in the nature of scowls or frowns, and shook his head from side to side in a negative manner," and was thus guilty of improper conduct before the jury and thus prevented the defendant from receiving a fair and impartial trial at the hands of the jury.

This matter was offered as misconduct of the court in the motion for a new trial and evidence was heard relative thereto. Five jurors testified that they saw such an incident but gave it no significance, and it had no effect upon them in any way; and five other jurors denied seeing such incident at all and, of course, were not affected thereby. There does not appear to have been any notice of such alleged conduct taken at the time same was supposed to have happened, and naturally no exception followed. The statute (Art. 707, C. C. P.), prohibiting the trial court from discussing the evidence or making any remark calculated to convey to the jury his opinion of the case, should be, and usually is, rigidly enforced, and this court would not hesitate to invoke the same wherein its violation is shown. However, in the present instance, we are at a loss to see how we can rule on the expression on the face of a judge, or what was meant by means of a scowl or a frown or a movement of the head. The trial itself seems to have been fairly held, and appellant was allowed a wide latitude in presenting his evidence before the court and the jury. We do not perceive any error presented in this bill.

Bill of Exception No. 3 relates to the testimony of the wife of the deceased wherein she was allowed, over appellant's objections, to testify relative to the army record of the deceased, and also as to the number and ages of their three children. This bill contains two subjects and may be multifarious, but we confess our inability to see any injury to appellant in allowing the army service record of the deceased to have been testified to by his wife. One of the reasons given by appellant for firing a multitude of shots at and into the body of the deceased was because of the fact that the army had trained our young men in physical combat so that they were enabled to kill a person with their bare hands. This is evidenced by an excerpt from appellant's testimony as follows:

"* * * but I know and you know and everybody knows that has been overseas, they teach those boys to kill and train them in the art, and they know how to kill with their hands or their boots, or any method they have to use."

We again quote from the appellant's testimony as follows:

"As to whether I knew then he was a soldier, I didn't know anything about the man's record. As to whether I knew he was a soldier when he apparently was going to take my life or when I thought he was going to stomp me to death, I knew a number of these young men had been in the service and had been

given that training, and he wore paratrooper boots or something to that effect, very heavy shoes, and he could have inflicted very serious bodily injury or stomped me to death."

We see no injury in showing the service of the deceased overseas, nor can we see any serious injury in allowing the wife of the deceased to testify relative to the family as follows:

"My husband and I had three children, and their ages are eight, ten and twelve years."

Bill No. 4 is vague and indefinite and appears to have been based upon an objection of the state relative to an effort on the part of appellant's attorney to establish a certain fact. No certain question was asked and none objected to, so it seems, but such bill is based upon the trial court's refusal to allow such attorney to establish what it was contended the deceased's shirt showed relative to what point near the spine such bullet hole was located. Surely the shirt itself, being in evidence, enabled the jury to draw its own conclusions relative to where the bullet entered the deceased's body and from what point the pistol was fired.

In Bill of Exception No. 5 complaint is made of the fact that the jury received other evidence in their deliberations than that which was admitted before them in the course of the trial. As evidence of this, it was claimed that they discussed the sanity of the appellant. It was shown by one of the jurors that such "matter came up, but it was—* * * But some one spoke up and said that did not have anything to do with the case, so I don't think it went any further." Whereupon the district attorney objected to any testimony that would allow the jury to impeach their verdict; that the issue of appellant's sanity was not raised either in the testimony or in the charge; that no affidavit was present relative to any misconduct of the jury, and this testimony was an effort to allow the jury, which had been polled, to impeach their verdict. The trial court refused to allow any further interrogation upon this matter in an effort to impeach this verdict under the condition of the record at such time. We think he was correct in such ruling. It has been held many times that jurors may not be allowed to impeach their own verdict. See Franco v. State, 141 Tex. Cr. R. 246, 147 S. W. (2d) 1089; Flanagan v. State, 151 S. W. (2d) 803, 142 Tex. Cr. R. 177; Bell v. State, 144 Tex. Cr. R. 106, 161 S. W. (2d) 109; Arnold v. State, 148 Tex. Cr. R. 310, 186 S. W. (2d) 995; Jureczki v. State, 152 Texas Crim. Rep. 88, 211 S. W. (2d) 231.

Bill No. 6 relates to the trial court's continued refusal to allow appellant to attempt to show that the jury in its deliberations discussed the fact as to whether or not appellant, in his defense, had been schooled by his attorneys and such defense had been framed by his lawyers, as well as a further attempt to show that appellant's sanity had been discussed by the jury. We think that these allegations, unsupported by any affidavit, merely evidence an attempt to find out the method by which the minds of the jurors finally arrived at a unanimous conclusion relative to appellant's guilt without any proper predicate being laid upon which misconduct of such jury could be based. These allegations made in a motion for a new trial should have been placed upon some material basic reason rather than an expedition into the jury room in order to find some reason for the granting of a new trial because of so-called misconduct of a jury. The jury cannot be thus allowed to review and impeach their verdict except in a manner sanctioned by law. We do not find such manner here present. Surely each juror is allowed a judgment of his own in regard to what impression a witness and his testimony has made upon the juror, and his opinion as to whether he thinks such testimony is true or untrue. These are matters of proper comment upon the juror's part where such views are based upon what took place in the trial and in the presence of the jury. Such views should and evidently did influence each juror, and unless some are also intermingled with outside knowledge and testimony, they are a legitimate discussion within the jury room. Their opinion of appellant based upon his testimony at the trial and his statements, as well as his demeanor, are exclusively within their province and should not come under the provisions of Art. 753, subd. 7, C. C. P., as grounds for the granting of a motion for a new trial.

What we have said above also disposes of Bills Nos. 7, 8, 9, and 10.

Under the record here present, we find no error shown, and the judgment will accordingly be affirmed.

## ON APPELLANT'S MOTION FOR REHEARING.

BEAUCHAMP, Judge.

Appellant's motion for rehearing insists that Bill of Exception No. 2 shows error requiring a reversal of his case. We have reconsidered the bill, and the language used in the original opinion, and find ourselves unable to agree with this contention.

Admittedly, the trial court can in some manner by facial expression or gesture commit error, which, if properly presented to this court, might require reversal of the case. It is the duty of the court to refrain from any facial or other expression which would convey to the jury his opinion of the parties, or any issue in the case. This court, however, cannot indulge in any speculation in order to find that such was done. From the evidence discussed in the original opinion it is revealed that we would have to go a long way to reach such conclusion.

Appellant presented his complaint of this conduct of the court for the first time on a motion for a new trial. The burden there rested on him to present facts to prove his contention. When we summarize the facts as found in the record we do not think they are sufficient. The trial court had the duty to pass on them and his finding, under the circumstances of this case, must be respected by this court.

The motion for rehearing is overruled.