**Opinion issued October 19, 2021**



In The

# Court of Appeals

For The

# First District of Texas

—————————————

## NO. 01-20-00297-CR

—————————————

**DRAKE COSTILLA, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 428th District Court**
**Hays County, Texas\***
**Trial Court Case No. CR-18-0306-D**

---

## O P I N I O N

This appeal arises from a prosecution for domestic violence. Drake Costilla

---

\*    Per the Texas Supreme Court's docket-equalization powers, this appeal was transferred from the Third Court of Appeals to this court on April 9, 2020. *See* TEX. GOV'T CODE § 73.001; Order Regarding Transfer of Cases from Courts of Appeals, Misc. Docket No. 20-9048 (Tex. Mar. 31, 2020). We are unaware of any relevant conflict between the Third Court's precedent and ours. *See* TEX. R. APP. P. 41.3.

was indicted and tried for the felony offense of continuous violence against a family member, his live-in girlfriend. The jury found him guilty of the lesser-included misdemeanor offense of assault causing bodily injury—family violence. Costilla contends we must reverse his conviction because the trial court:

(1) erred in denying his directed-verdict motion as to an assault that allegedly occurred a month before the one resulting in conviction;

(2) violated his constitutional right to confront the complainant when it allowed her to testify with use and derivative use immunity;

(3) commented on the weight of the evidence by admitting the application for and order granting use and derivative use immunity; and

(4) erroneously instructed the jury as to the mental state required to convict him of the lesser-included misdemeanor offense.

We affirm.

## BACKGROUND

A grand jury indicted Costilla for the third-degree felony of continuous violence against the family. *See* TEX. PENAL CODE § 25.11(a), (e). The indictment alleged that Costilla intentionally, knowingly, or recklessly caused bodily injury to Christina Frausto, a member of his family or household or a person with whom he had a dating relationship, on two occasions within the span of a year, specifically on October 12 and November 12, 2017. *See* TEX. FAM. CODE §§ 71.0021(b), 71.003, 71.005 (defining dating relationship, family, and household).

2

Costilla pleaded not guilty to the charged offense. The case was tried to a jury, which heard testimony from several witnesses, including two responding patrol officers, Frausto, and three acquaintances or friends of Frausto and Costilla.

B. Pierce, a patrol officer with the San Marcos Police Department, testified that he was dispatched to Costilla and Frausto's apartment about an alleged assault on the evening of November 12. Costilla, who was then 20 years old, had requested emergency assistance claiming that Frausto, his live-in girlfriend, who was 18 years old and two months pregnant at the time, had repeatedly struck him.

When Pierce arrived at the scene, Costilla was standing outside the apartment and was still on the phone with the dispatcher. Costilla was shirtless, and he had visible scratches on his torso, shoulders, and neck.

Pierce was wearing a body camera. The audio and video recording from his body camera was played for the jury, subject to a limiting instruction that the statements of the patrol officers themselves and the statements of Frausto picked up by Pierce's body camera were not offered for their truth.

As shown on the video, Costilla told Pierce that Frausto had wanted to return to her mother's home. Costilla stated that Frausto began packing to leave, and he tried to talk her out of leaving. She became frustrated and "started throwing punches," hitting him in the jaw. Costilla stated that he then swept Frausto's leg, took her to the floor, and got on top of her, because he did not "want to get punched

3

anymore." Frausto got one hand free and scratched him while he was on her. Costilla denied that he had covered Frausto's mouth with his hand.

Costilla told Pierce that he and Frausto had fought on multiple occasions. Costilla said the last time was about four weeks prior in October 2017. He indicated that Frausto had been violent in the past but that he had not reciprocated her violence, apart from taking her to the floor "every time she starts being this way." According to Costilla, Frausto had told him that this was how her brother calmed her down when she previously resided with her brother. Costilla told Pierce that Frausto sometimes required restraint due to her anger problem. Costilla also said that mental health issues run in Frausto's family.

When Pierce arrived, Costilla had Frausto's cell phone in his possession in addition to his own cell phone. On the video, Costilla admitted he had taken Frausto's phone away from her, explaining that he did so because when Frausto gets angry with him she talks to other men.

Pierce testified that Costilla's injuries were inconsistent with his story. Pierce stated that typically an attack like the one Costilla described would "inflict offensive injuries" via closed fist or open hand, not scratches, which are "congruent with a defensive wound" by someone being restrained. Yet, Pierce did not see any marks on Costilla other than the scratches. Pierce conceded that there was some redness on

4

Costilla's chest that he had not noticed at the time due to the dim lighting at the scene. But Pierce testified that it was difficult to say what caused the redness.

Ultimately, Pierce arrested Costilla and took him to jail. Pierce photographed Costilla at the jail, and these photographs were admitted into evidence. These photographs showed the scratches Frausto inflicted on Costilla.

Corporal J. Cormier arrived on the scene after Pierce. Cormier went inside the apartment and spoke with Frausto.

Cormier testified that when he spoke with Frausto she was very upset and very timid. Cormier stated that she was visibly crying throughout the interview.

Cormier also wore a body camera. Part of the audio and video recording from his body camera was played for the jury, subject to two limiting instructions. First, the trial court instructed the jury that statements made by the patrol officers and dispatcher were not offered for their truth. Second, the court instructed the jury that it could only consider statements about Costilla's prior acts if it believed they occurred beyond a reasonable doubt and could not consider them as character evidence or proof of guilt of another act.

As shown on the video, Cormier interviewed Frausto in a bedroom not far from where Pierce and Costilla were standing. Frausto told Cormier that she had tried to leave the apartment to return to her mother's home and began to gather some belongings. Costilla responded by taking Frausto's phone from her so she could not

talk to her mother and trying to tackle her. Costilla told Frausto that she was not going to leave, and he kicked her to the floor or took her to the floor with his leg. Once Costilla had Frausto on the floor, he put one of his hands over her mouth and nose, which impeded her breathing.

Frausto told Cormier that Costilla did not have his hand over her mouth and nose for too long. Frausto explained that she scratched Costilla to get him off of her so that she could breathe again. Frausto denied hitting Costilla other than in self-defense.

When Cormier asked Frausto if she and Costilla fought a lot, she replied that they only did so when she tried to go back home. Frausto stated that Costilla had held his hand over her mouth before. Frausto said that the previous time Costilla did so, he used so much force that a piercing on her lip pressed inward and injured the inside of her mouth.

Like Pierce, Cormier testified that Costilla's injuries were inconsistent with his version of events but corroborated Frausto's account.

In addition, Cormier took several photographs of Frausto, and these photographs were admitted into evidence. Cormier testified that one photograph showed her hair was "very disheveled in the back." Cormier also testified that some of these photographs documented that Frausto had red and swollen blood vessels in her left eye. But Cormier agreed that there was no sign of petechia, or broken

6

capillaries, which is a physical indicator of strangulation or the obstruction of one's ability to breathe. Cormier nonetheless maintained that Frausto's appearance, as shown in the photographs he took, corroborated her version of events.

At trial, Frausto was a reluctant witness. She stated she did not want to testify and asked if she could "plead the Fifth." The State was only able to secure Frausto's testimony by agreeing that it would not use her testimony or any facts derived from her testimony "as evidence against her in any criminal proceeding other than a prosecution for perjury, aggravated perjury, or contempt." Both the State's application for testimonial immunity and the trial court's order granting it were introduced into evidence.

Frausto testified that she and Costilla dated for six months when she was in high school, and she became pregnant. She lived with him and some roommates in a two-bedroom apartment when the November 12 altercation happened. Frausto and Costilla are no longer together, but they coparent their young son, who stays with Costilla on weekends. Costilla helps her with their son and provides financial support.

On the evening of the November 12 altercation, Frausto and Costilla had been arguing. When questioned by the State at trial, however, Frausto disclaimed any memory of their ensuing altercation:

Q. Did—did the defendant—did Drake ever push you down?

A. I don't remember.

Q. Did Drake ever sweep your feet out from underneath you and get on top of you?

A. I don't remember.

Q. Did Drake ever cover your mouth with his hand?

A. I don't remember.

The State tried to refresh Frausto's recollection by showing her the written statement that she had made and signed when Pierce and Cormier responded to the November 12 altercation. Though Frausto acknowledged that she wrote and signed the statement, she said it did not refresh her memory:

Q. Does reading that statement help refresh your memory about it?

A. Somewhat.

Q. So when you made that statement, were you able to recall more details than you can recall now?

A. Somewhat.

Q. So can you still remember the event right now?

A. No.

Frausto explained that she had no memory of the altercation because it had occurred "two years ago" and she had "been through so much."

Frausto further testified that she did not recall whether the November 12 statement she had given to the police was accurate. When asked whether she would have signed an inaccurate sworn statement, she claimed she "didn't swear to anything," despite the statement's contrary representation. Frausto testified, "I didn't

know what I was signing." She explained, "I didn't even know this was, like, that even serious or anything like that."[1]

After being questioned about her November 12 written statement to the police, Frausto answered that she did not remember what had happened in reply to most of the State's questions about that evening's altercation. She likewise answered that she did not remember what had happened during prior altercations, including whether Costilla had ever injured her by pressing her lip piercing into her mouth.

Later, when questioned by defense counsel, Frausto conceded that her trial testimony that she could not remember the November 12 altercation was false. Frausto explained that she had claimed not to remember because she did not want to admit that she had lied to the police. Frausto testified that her written statement to the police was not truthful and that she had lied about what happened to avoid going to jail. She explained, "The police will believe a female no matter what and that's

---

[1] The State wanted to read Frausto's November 12 written statement to the police aloud to the jury. Out of the presence of the jury, counsel questioned Frausto so that the trial court could decide whether the statement was admissible under the recorded recollection exception to the hearsay rule. During this questioning, Frausto confessed that she remembered the events of that night and that her written statement was false: "I was panicking during that whole time and I thought I was gonna be the one going to jail, because he called the cops on me. So writing that statement down, I agree, like some of it is false reports, because I was panicking too much. I didn't want to go to jail." Frausto elaborated, "It's not true. The statement's not true." She explained, "I didn't want to go to jail and I just lied." As Frausto disavowed her written statement, the trial court refused the State's request to read it aloud to the jury.

exactly how it worked." According to Frausto, Costilla went to jail instead of her because the police believed her false version of events.

Frausto testified that she did not know Costilla would be charged with a felony. And she stated that she did not want him to get into trouble. She explained that she did not want him to go to jail; she wanted him to be able to get a better job, so that he could help her provide for their child. Frausto testified that Costilla was not guilty of the charged offense.

Both sides questioned Frausto about an interview she had with a representative of the Attorney General's Office in June 2018.[2] But Frausto said she could not remember what she told this representative.

Several other people were in the apartment on November 12. But none of them witnessed that evening's altercation or meaningfully interacted with the police.

Luis Martinez, one of Frausto and Costilla's roommates, testified that he and his girlfriend, Chantel Espinoza, were present that evening. At one point while they were watching television in the living room, Martinez said he heard some noise— "just like bumping, people walking around" or possibly "some muffled screaming"—from Frausto and Costilla's bedroom. Martinez turned down the television's volume to verify if he "was hearing correctly" but heard nothing. He

---

[2]  Because one of Costilla's relatives worked for the Hays County Criminal District Attorney, that office recused itself from this case. The Texas Attorney General's Office prosecuted this case in the Criminal District Attorney's stead.

10

testified that if he had thought something untoward was happening, he would have intervened. Shortly afterward, Costilla came out and told Martinez and Espinoza that the cops were on the way. Martinez and Espinoza then left the apartment. When they returned later that evening, Frausto seemed like she was in shock.

Espinoza also testified. She had only recently begun dating Martinez and did not really know Costilla. Espinoza stated that while she and Martinez were watching television, she heard "muffled" noise "like when you're talking aloud and you're not supposed to and somebody just covers your mouth." But Espinoza also characterized this noise as sounding like "muffled talking" or even "normal talking." And when Martinez turned down the television's volume, Espinoza did not hear anything. Like Martinez, she was not concerned that something was awry.

Espinoza stated that she and Martinez left after Costilla told them the police were coming. Espinoza said that when they later returned to the apartment, Frausto "didn't show any kind of emotion" and was "straight-faced, like she didn't know how to react." Espinoza stated that Frausto did not have visible injuries.

Frausto and Costilla's other roommate, Mike Gonzalez, did not testify. But Gonzalez's girlfriend, Esmeralda Hernandez, did. Hernandez did not know either Frausto or Costilla very well, but she was at the apartment on the night of the altercation. She and Gonzalez were in another bedroom when the altercation occurred. Hernandez did not know anything was amiss at the time. After the police

11

came and went, Hernandez testified, Frausto looked like she was "in a state of shock" and her eyes were redder than usual. Hernandez conceded that when she was originally interviewed by personnel from the Attorney General's Office, she had not described Frausto as being in shock after the police left the apartment.

After the State rested, Costilla moved for a directed verdict as to the felony offense of continuous family violence, and the trial court denied his motion. Costilla also moved for a directed verdict as to the October 12 assault, in which he allegedly pressed Frausto's mouth and lip piercing so hard with his hand that the piercing injured her. The trial court denied this directed-verdict motion as well.

The defense introduced a recording of Costilla's 911 telephone call into evidence, subject to a limiting instruction that the jury was not to consider the statements Costilla made during the call for the truth of the matter asserted. After the recording was published to the jury, the defense rested.

The jury acquitted Costilla of the felony offense of continuous family violence. But it found him guilty of a lesser-included offense, the class A misdemeanor of assault causing bodily injury—family violence, based on the November 12 altercation. *See* PENAL § 22.01(a)(1), (b). The trial court assessed Costilla's punishment at one year of confinement in the county jail, suspended the sentence, and placed Costilla under community supervision for two years.

Costilla appeals.

## DISCUSSION

### I.      Directed Verdict

Costilla contends that the trial court erred in denying his motion for directed verdict regarding the October 12 assault, the one in which he allegedly injured Frausto's mouth by pressing on her mouth and lip piercing with his hand a month before the altercation that resulted in his arrest. Costilla maintains that he was harmed by the trial court's failure to grant a directed verdict as to the October 12 assault because the jury might have chosen to acquit him altogether if the sole issue before it had been whether he committed the November 12 assault that resulted in his arrest and conviction for assault causing bodily injury—family violence.

#### A.      Standard of review and applicable law

We treat a complaint about a trial court's refusal to grant a motion for directed verdict as a challenge to the legal sufficiency of the evidence. *Williams v. State*, 937 S.W.2d 479, 482 (Tex. Crim. App. 1996). A legal-sufficiency challenge requires us to determine whether, viewing the evidence in the light most favorable to the verdict, any rational jury could have found the essential elements of the crime beyond a reasonable doubt. *Lang v. State*, 561 S.W.3d 174, 179 (Tex. Crim. App. 2018). If we find the evidence is legally insufficient, we must reverse the appellant's conviction. *See id.* at 184 (reversing conviction because evidence was legally insufficient);

13

*Brooks v. State*, 323 S.W.3d 893, 903 (Tex. Crim. App. 2010) (reversal on appeal for legal insufficiency of evidence has same effect as acquittal by jury).

**B.    Analysis**

Though framed as a legal-sufficiency complaint, Costilla's complaint is not a cognizable legal-sufficiency challenge. A legal-sufficiency challenge asserts that the evidence would not allow any reasonable jury to find one or more essential elements of the offense of conviction. *See Lang*, 561 S.W.3d at 179. Here, however, Costilla challenges the legal sufficiency of the evidence supporting a finding that he committed the offense of assault during the October 12 altercation, which is not a finding the jury made. Nor did the jury find Costilla guilty of continuous family violence based in part on his conduct during the October 12 altercation. Instead, the jury found Costilla guilty of a lesser-included offense, assault causing bodily injury—family violence, based on his conduct in the separate and distinct November 12 altercation. Under these circumstances, even if we sustained Costilla's legal-sufficiency challenge, doing so would not result in reversal of his conviction or the entry of a judgment of acquittal because his conviction is based on evidence of different conduct on another occasion than the offense he challenges.

In other words, Costilla asks us to decide whether there is legally sufficient evidence with respect to an offense for which he was not convicted, namely the alleged October 12 assault. This is a request for an advisory opinion. An opinion is

advisory when a court tries to resolve an issue that does not arise from an actual controversy between the parties. *State v. Velasquez*, 539 S.W.3d 289, 295 n.39 (Tex. Crim. App. 2018); *e.g.*, *Castaneda v. State*, 138 S.W.3d 304, 309 (Tex. Crim. App. 2003) (holding that appellant could not challenge whether surety was liable for bail bond forfeiture when principal is deported given that appellant wasn't deported before failing to appear in court and issue thus called for advisory opinion). Similarly, an opinion is advisory when a court tries to resolve an issue but the party seeking review of the issue will not benefit from its resolution in any way. *Pfeiffer v. State*, 363 S.W.3d 594, 601 (Tex. Crim. App. 2012); *e.g.*, *State v. Haley*, 811 S.W.2d 597, 598–99 (Tex. Crim. App. 1991) (holding in effect that State could not challenge ruling not made by trial court because it would result in advisory opinion). We lack the authority to render an advisory opinion. *Pfeiffer*, 363 S.W.3d at 601. Thus, we cannot review evidence for legal sufficiency if that evidence is immaterial to the appellant's conviction or will not entitle him to some other relief.

Costilla tries to avoid the prohibition on advisory opinions by arguing that the denial of his motion for a directed verdict as to the October 12 altercation potentially affected the verdict that the jury actually rendered. He explains:

> The jury did not find Mr. Costilla guilty of continuous assault family violence, because there simply was not any evidence of the alleged October 12th offense. The State will likely argue that Mr. Costilla's argument is therefore moot, because Mr. Costilla was acquitted of the October 12th offense. However, as the Court is well aware, it is common for jurors to "split the baby" when they are given

15

a lesser-included offense. Therefore, if the trial court had properly granted the directed verdict, and the jury's only option was to find Mr. Costilla guilty of a class A misdemeanor, it is Mr. Costilla's position that the jury would have acquitted Mr. Costilla.

Contrary to Costilla's suggestion, however, we cannot assume that the jury "split the baby." Instead, we must presume that the jury followed the trial court's instructions absent evidence to the contrary. *Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005). The trial court instructed the jury that Costilla was presumed innocent and the State bore the burden to prove his guilt. In the application paragraphs for the offense of continuous family violence and the lesser-included offense of assault causing bodily injury—family violence, the trial court likewise instructed that the jury was to find Costilla "not guilty" unless it found from the evidence beyond a reasonable doubt that he was guilty or if it had reasonable doubt about his guilt. These instructions implicitly disallowed the jury from rendering a compromise verdict, and Costilla does not refer to any evidence that the jury disobeyed them. Thus, we must presume the jury obeyed the charge, and we reject Costilla's suggestion that the trial court's refusal to grant his directed-verdict motion as to the October 12 assault affected the jury's verdict as to the November one.

In sum, Costilla does not challenge the legal sufficiency of the evidence supporting the only offense for which he was convicted, assault causing bodily injury—family violence, which was based on the November 12 altercation. Instead, he challenges the sufficiency of the evidence with respect to the October 12

16

altercation. Thus, even if we sustained Costilla's legal-sufficiency challenge, we could not reverse his conviction. Nor would the resolution of Costilla's challenge in his favor benefit him in any other way. In particular, we reject Costilla's argument that the ostensible legal insufficiency of the evidence as to the October 12 assault prompted the jury to render a compromise verdict acquitting him of continuous family violence but finding him guilty of the lesser-included offense of assault causing bodily injury—family violence based on the November 12 altercation. As there is no evidence that the jury rendered a compromise verdict, we must presume the jury obeyed the trial court's instruction to find Costilla guilty only if the State proved his guilt beyond a reasonable doubt. On this record, Costilla's legal-sufficiency challenge seeks an advisory opinion, which we cannot render. We overrule his legal-sufficiency challenge.

## II. Right of Confrontation

The trial court overruled Costilla's objection that allowing Frausto to testify with use and derivative use immunity violated the United States and Texas Constitutions by denying him "an effective right to confront and cross-examine" her. *See* U.S. CONST. amend. VI; TEX. CONST. art. I, § 10. Costilla contends the trial court erred. The crux of his argument is that because the trial court granted Frausto immunity from prosecution for any crime, including perjury, it made her testimony so untrustworthy that his opportunity to cross-examine her was meaningless. Costilla

17

also seems to suggest that allowing crime victims or complaining witnesses to testify with use and derivative use immunity always violates a defendant's right to confront the witnesses against him when the defendant's guilt or innocence essentially turns on the veracity and credibility of these victims or witnesses.

## A. Standard of review and applicable law

We review a trial court's ruling on a Confrontation Clause objection de novo. *Campos v. State*, 186 S.W.3d 93, 96 (Tex. App.—Houston [1st Dist.] 2005, no pet.).

Both the United States and Texas Constitutions contain provisions that guarantee a criminal defendant the right to confront witnesses. *See* U.S. CONST. amend. VI; TEX. CONST. art. I, § 10. We interpret these provisions to confer the same right absent a compelling reason to interpret them differently. *Gonzales v. State*, 818 S.W.2d 756, 764 (Tex. Crim. App. 1991). Under these provisions, the defendant has the right to "physically confront those who testify against him." *Haggard v. State*, 612 S.W.3d 318, 324 (Tex. Crim. App. 2020). The main purpose of these provisions is to ensure that the defendant has the chance to cross-examine witnesses because cross-examination is the principal means of testing their credibility and veracity. *Johnson v. State*, 490 S.W.3d 895, 909 (Tex. Crim. App. 2016). Thus, the right of confrontation includes not only the right to compel a witness to take the stand at trial, but also the opportunity to conduct a meaningful and effective cross-examination. *Coronado v. State*, 351 S.W.3d 315, 325 (Tex. Crim. App. 2011).

Nonetheless, the right to cross-examine witnesses is not unqualified. *Johnson*, 490 S.W.3d at 909. A defendant is not constitutionally entitled to cross-examination that is effective in whatever way, or to whatever extent, he deems expedient. *Id.* at 909–10. The trial court retains broad discretion to limit questioning based on rules of procedure and evidence, so long as the court does not deprive the defense of the ability to effectively cross-examine witnesses, such as by limiting questioning to such a degree that it forecloses the presentation of a vital defense theory. *Id.* at 909–11. A less than optimal opportunity for cross-examination, of itself, is not a constitutional violation. *Balderas v. State*, 517 S.W.3d 756, 779 (Tex. Crim. App. 2016). Only when the trial court restricts cross-examination to an extent so great that its restriction makes the examination wholly ineffective does it violate the right of confrontation. *Johnson v. State*, 433 S.W.3d 546, 557 (Tex. Crim. App. 2014).

Both the United States and Texas Constitutions also contain provisions that confer a right against self-incrimination. U.S. CONST. amend. V; TEX. CONST. art. I, § 10. Though phrased differently, these provisions essentially guarantee the same right. *See Cobb v. State*, 85 S.W.3d 258, 267 n.30 (Tex. Crim. App. 2002). The scope of the right is comprehensive; it protects one from being called as a witness against herself by the State in a criminal prosecution and allows her to refuse to answer questions in other proceedings when the answers might incriminate her in a future prosecution. *In re Medina*, 475 S.W.3d 291, 299 (Tex. Crim. App. 2015).

In general, when there is no possibility of incrimination, there is no right against self-incrimination. *See id.* at 300–01. Thus, when a trial court compels a witness to testify in exchange for a grant of use and derivative use immunity, the right against self-incrimination no longer applies. *Butterfield v. State*, 992 S.W.3d 448, 449–50 (Tex. Crim. App. 1999). This is because a grant of use and derivative use immunity eliminates any risk of self-incrimination associated with a witness's testimony by guaranteeing the State cannot use incriminating statements, or evidence derived from those statements, in a subsequent criminal prosecution. *See Medina*, 475 S.W.3d at 297. It is well-established, however, that a witness who has been granted use and derivative use immunity may still be prosecuted for perjury if she perjures herself on the stand because the grant of immunity does not authorize her to be untruthful when testifying under oath. *Butterfield*, 92 S.W.2d at 450.

The grant of use and derivative use immunity to compel a witness to testify does not implicate, let alone violate, the defendant's right of confrontation because the witness is present and subject to cross-examination. *See Johnson*, 433 S.W.3d at 551 (main and essential purpose of confrontation is opportunity to cross-examine because that is how veracity and credibility of witnesses are tested). This is true even if the witness testifies that she does not remember in response to defense counsel's questions, so long as the defense has the chance to probe her lack of memory. *Woodall v. State*, 336 S.W.3d 634, 643–44 (Tex. Crim. App. 2011). But if a witness

20

who has been granted use and derivative use immunity categorically refuses to answer questions on cross-examination or fails to answer questions to such a significant extent that it makes cross-examination meaningless, this violates the defendant's right to confront the witnesses against him. *Preston v. Superintendent Graterford SCI*, 902 F.3d 365, 370–71 & n.5, 380–82 & n.17 (3d Cir. 2018).

## B.    Analysis

Costilla's principal argument is based on a misunderstanding of the trial court's order granting Frausto use and derivative use immunity. He maintains that the order immunized Frausto from a perjury charge if she lied on the stand, which made her testimony unreliable. But the trial court's order did not immunize her from being charged with the offense of perjury if she committed perjury at trial.

At trial, Frausto invoked her Fifth Amendment right not to testify because her testimony might incriminate her. The State then applied to compel Frausto to testify in exchange for use and derivative use immunity, and the trial court granted the State's application and ordered Frausto to testify.

In its order granting Frausto use and derivative use immunity, the trial court expressly excluded perjury at trial from the scope of immunity that it granted:

> PROVIDED, HOWEVER, no testimony or other information so compelled under this Order or any information directly or indirectly derived therefrom may thereafter be used against the said witness, CHRISTINA FRAUSTO, except in prosecution for perjury, aggravated perjury, or contempt, or otherwise failing to comply fully and completely with the terms and directions of this Order. This grant of

21

immunity extends only to testimony and evidence given by the witness, CHRISTINA FRAUSTO, in the above referenced trial.

Thus, contrary to Costilla's assertion, the trial court did not grant Frausto immunity from perjury as to her testimony at trial. Consistent with longstanding practice, Frausto remained subject to prosecution for perjury in the event that she perjured herself on the stand. *See Butterfield*, 992 S.W.2d at 450 (describing criminal liability for perjury as "nearly universal exception" to grants of testimonial immunity).

Costilla does not address the trial court's order. Instead, he argues that the State assured Frausto that she could not be prosecuted for perjury while she was on the stand. Costilla relies on the following exchange between the State and Frausto:

Q. All right. Christina, when we took a break earlier—have you been given immunity for testifying here today?

A. What do you mean? Like, can you dumb it down a little?

Q. Sure. So earlier you said that you were pleading the Fifth, that you didn't want to testify because pleading the Fifth means that you're going to incriminate yourself for some crime.

A. Uh-huh.

Q. And so—

A. Oh, yeah.

Q. So has the State said that they will not prosecute you for the crime of perjury if—and that's for a false report to the police officers, if you change your testimony in between what you've said before and now.

A. Uh-huh.

Q. Do you understand that?

22

A. Yes.

But this exchange contradicts, rather than supports, Costilla's argument. The State did not represent to Frausto that it would not prosecute her if she perjured herself on the stand. Instead, the State said it would not prosecute Frausto for perjury if she disavowed the version of events she related to the police in the sworn statement she gave on the night of the November 12 altercation. In short, the State's description of Frausto's immunity corresponds to the trial court's written order, which provided that she could not be prosecuted for self-incriminating statements. Consistent with the oath Frausto took when she was sworn as a witness, she remained obliged to testify truthfully despite the grant of use and derivative use immunity.

To the extent Costilla argues that the trial court's grant of use and derivative use immunity to Frausto somehow deprived him of the right to effectively cross-examine her aside from his mistaken claim that she was immunized from prosecution if she perjured herself on the stand, we disagree. Costilla does not cite any authority for the proposition that granting use and derivative use immunity to an alleged victim of a crime or complaining witness generally violates a defendant's right of confrontation. Nor can Costilla claim that it did so in this particular case.

During defense counsel's cross-examination of Frausto, Frausto testified that:

- the statement she gave to the police on the night of the November 12 altercation was false and she misled the police to avoid going to jail;

- her claim that she did not recall details about this altercation was false and she lied about her memory to avoid admitting she had misled the police; and

- the charges the State brought against Costilla were not accurate and Costilla was not guilty of the offenses for which the State was trying him.

Thus, during defense counsel's cross-examination of Frausto, he secured admissions from her that undermined the very basis of the prosecution by calling into doubt the veracity and credibility of her prior allegations against Costilla.

While Frausto said she did not recall in response to multiple questions during cross-examination, a witness's lack of memory does not violate a defendant's right of confrontation, so long as his counsel has the chance to probe the witness's recall. *Woodall*, 336 S.W.3d at 643–44. Costilla's counsel had the chance to do so.

In addition, all the questions about which Frausto disclaimed memory on cross-examination concerned statements she allegedly made to a representative of the Attorney General's Office. If these prior statements were reduced to writing or recorded, they were not introduced into evidence in written or recorded form or otherwise. Nor was their content disclosed to the jury except to the extent that defense counsel's questions indirectly did so. As characterized by defense counsel in his questions during cross-examination, these prior statements essentially corroborated Frausto's trial testimony that she had misled the police on the night of the altercation. Counsel's questions, of course, are not evidence. *Madden v. State*, 242 S.W.3d 504, 513 & n.23 (Tex. Crim. App. 2007). But to the extent that the jury

24

could have (improperly) formed an impression based on defense counsel's questions about these prior statements and Frausto's purported lack of memory about them, that impression would not have been disadvantageous to Costilla's defense.

In sum, the trial court did not immunize Frausto from perjury in the event that she perjured herself on the stand. Moreover, Frausto neither categorically refused to answer questions on cross-examination nor failed to answer questions to such a significant extent that it made cross-examination meaningless. *Cf. Preston*, 902 F.3d at 370–71 & n.5, 380–82 & n.17 (holding that defendant was deprived of opportunity to effectively cross-examine accomplice in violation of Confrontation Clause when trial court admitted into evidence accomplice's prior statement to police and testimony from accomplice's own criminal trial but accomplice responded "no comment" to all but three of defense counsel's questions, none of which were pertinent to veracity of accomplice's prior statement or testimony or accomplice's credibility in general, while on the stand during defendant's trial despite having been granted use and derivative use immunity). We therefore reject Costilla's complaint that the trial court erred in overruling his objection as to the right of confrontation.

## III.   Improper Comment on Weight of Evidence

Costilla contends the trial court improperly commented on the weight of the evidence by admitting into evidence the State's application for use and derivative use immunity and the trial court's order granting the application. Based on the

language of the application and order, Costilla maintains that they could only have been understood by the jury as a guarantee of Frausto's veracity and his guilt.

## A. Standard of review and applicable law

Article 38.05 of our Code of Criminal Procedure provides that when ruling on the admissibility of evidence, a trial court "shall not discuss or comment upon the weight of the same or its bearing in the case, but shall simply decide whether or not it is admissible." This statutory mandate means exactly what it says: a trial court must announce its evidentiary rulings without elaborating on the evidence. *Simon v. State*, 203 S.W.3d 581, 590 (Tex. App.—Houston [14th Dist.] 2006, no pet.). Whether the trial court violated Article 38.05 is a question of law, which we review de novo. *See id.* at 590–92 (stating appellate court's first inquiry under statute is deciding whether challenged remarks constitute comment on weight of evidence and making independent review of record and concluding that trial court erred). If the trial court errs by violating Article 38.05, the error requires reversal if the trial court's comment was reasonably calculated to benefit the State or prejudice the defendant's rights. *Proenza v. State*, 541 S.W.3d 786, 791 (Tex. Crim. App. 2017).

## B. Analysis

Costilla does not claim that the trial court discussed or commented on the application for use and derivative use immunity or the corresponding order in the jury's hearing when the trial court admitted them into evidence. Nor could Costilla

do so, given that the trial court ruled on the application's and order's admissibility during a bench conference held outside the jury's hearing. In addition, Costilla does not characterize any remark made by the trial court as an improper comment on the weight of the application or order. Instead, Costilla argues that the very act of admitting them into evidence was a comment on the evidence.

Article 38.05 is not susceptible to the interpretation Costilla tries to give it. The statute forbids a trial court from discussing or commenting on the weight of the evidence when it decides whether the evidence is admissible. TEX. CODE CRIM. PROC. art. 38.05. The statute directs the trial court to "simply decide whether or not it is admissible." *Id.* This directive implicitly contemplates that the admissibility decision itself, unaccompanied by further remarks by the court, cannot constitute an improper comment under Article 38.05. *See Smith v. State*, 595 S.W.2d 120, 123–24 (Tex. Crim. App. [Panel Op.] 1980) (trial court's statement overruling objection was not comment on weight of evidence). As Article 38.05's plain language indicates, the trial court cannot violate the statute unless it engages in discussion or commentary beyond the announcement of its decision. *See Hill v. State*, 217 S.W.2d 1009, 1011–12 (Tex. Crim. App. 1948) (holding trial judge's supposed frowns, scowls, and head-wags were not susceptible to review as comments on weight of evidence).

Moreover, the record shows that any remarks the trial court made about the application and order when deciding whether they were admissible were made during a bench conference conducted out of the jury's hearing. Discussion or commentary that occurs outside the jury's presence or hearing neither benefits the State nor prejudices the defendant's rights and therefore cannot constitute reversible error. *Becknell v. State*, 720 S.W.2d 526, 532 (Tex. Crim. App. [Panel Op.] 1986); *see also Baca v. State*, 223 S.W.3d 478, 481–82 (Tex. App.—Amarillo 2006, no pet.) (statements made by trial court outside jury's presence could not have tainted presumption of innocence); *Murchison v. State*, 93 S.W.3d 239, 262 n.4 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd) (comments made by trial court outside jury's presence could not have affected right to impartial jury trial). In the civil context, we have gone so far as to hold that statements made by the trial court outside the jury's presence categorically cannot constitute comments on the weight of the evidence. *See Mieth v. Ranchquest, Inc.*, 177 S.W.3d 296, 304 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (declining to review such statements as comments on weight of evidence). Whether they are categorically excluded from the definition of comments on the weight of evidence or merely considered harmless, comments made outside of the jury's presence or hearing cannot constitute reversible error.

Costilla tries to sidestep the preceding authorities by attributing the statements made by the State in its application for use and derivative use immunity to the trial

28

court. Costilla posits that the application's language "conveyed to the jury that the trial court was guaranteeing that the alleged victim's testimony would be truthful, affording credibility to the alleged victim and ultimately fortifying the State's case." Of course, a trial court does not adopt or endorse the contents of an exhibit by ruling that it is admissible, and Costilla does not argue otherwise. Instead, Costilla argues that this particular situation is different because the trial court granted the State's application and stated in its order doing so "that the testimony sought by the State may be necessary to the public interest and so that justice may be served," which Costilla argues "communicated to the jury that the trial court had adopted the State's position that the alleged victim was in fact a victim."

We disagree for two independent reasons. First, Article 38.05 states that when "ruling upon the admissibility of evidence, the judge shall not discuss or comment upon the weight of the same or its bearing in the case." Thus, by its express terms, the statute applies to remarks made by the trial court about the evidence while ruling on its admissibility, not to remarks made within the evidence subject to the ruling. Here, the trial court ruled that the application and order were admissible during a bench conference. The application and order are evidence. Statements made within them cannot constitute a comment on their own weight. Nor can the application or order be construed as a comment on the weight of other evidence, such as Frausto's testimony, because neither the application nor the order address the admissibility of

29

other evidence. The State applied for an order requiring Frausto to testify with use and derivative use immunity, and the trial court granted the State's application. The trial court's order does not purport to rule on the admissibility of Frausto's trial testimony in general or on any particular aspect of her anticipated testimony. Thus, Article 38.05 does not apply to statements made in the application or order.

Second, even if the application and order could somehow be shoehorned into Article 38.05's coverage, Costilla's characterization of the contents of these documents and their supposed implications is unpersuasive. The trial court did not characterize Frausto as a victim. Nor did the trial court guarantee her truthfulness. In its order granting the State's application, the trial court found that Frausto was "a material witness." It concluded that her testimony "may be necessary to the public interest and so that justice may be served" and ordered her to appear and testify at Costilla's trial. But the trial court did not equate the public interest or justice with a verdict of guilty or a judgment of conviction. Nor did it suggest in any way that the jury ought to believe Frausto's testimony because it was bound to be truthful. On the contrary, the trial court's explicit statement that it was not granting Frausto immunity from "prosecution for perjury" was an acknowledgment that her untruthfulness was a possibility to be guarded against. Thus, even if statements in the application and order were subject to Article 38.05, they would not constitute an improper comment

on the weight of the evidence because the trial court did not, in fact, make or ratify any statements likes the ones Costilla tries to attribute to it.

For all these reasons, we overrule Costilla's Article 38.05 complaint.

## IV.  Jury Charge Error

Costilla contends the trial court erroneously instructed the jury on the mental state required to find him guilty of assault. Because assault is a result-oriented offense, Costilla argues, the trial court should have instructed the jury to convict him only if it believed beyond a reasonable doubt that he had the requisite culpability with respect to the result of his conduct, as opposed to the nature of his conduct or the circumstances surrounding his conduct. *See generally Young v. State*, 341 S.W.3d 417, 423 (Tex. Crim. App. 2011) (discussing how crimes fall into three general categories: those that criminalize the result of conduct, nature of conduct, and circumstances surrounding the conduct). Instead, the trial court instructed the jury that it could find him guilty if it found that he acted with the requisite culpability as to the result of his conduct or its nature or the surrounding circumstances. Costilla contends that this error allowed the jury to convict him on an improper basis.

### A.  Standard of review and applicable law

We review an alleged jury charge error regardless of preservation. *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). Our review of jury charge error consists of a two-step process. *Id.* We first determine whether the challenged

31

instruction is erroneous. *Id.* When we review a charge for error, we consider the charge as a whole rather than as a series of isolated and unrelated statements. *Vasquez v. State*, 389 S.W.3d 361, 366 (Tex. Crim. App. 2012). If the charge is erroneous, we then analyze the error for harm. *Kirsch*, 357 S.W.3d at 649.

The degree of harm required for reversal varies depending on whether error was preserved. *Id.* If the appellant did not preserve error, it is reversible only if it caused egregious harm. *Jordan v. State*, 593 S.W.3d 340, 346 (Tex. Crim. App. 2020). Under the egregious harm standard, the error warrants reversal if it resulted in so much harm that it deprived the defendant of a fair and impartial trial. *Chambers v. State*, 580 S.W.3d 149, 154 (Tex. Crim. App. 2019). But when, as here, the appellant preserved error, it is reversible so long as it caused some harm. *Jordan*, 593 S.W.3d at 346. Under the some harm standard, any harm whatsoever requires reversal. *Chambers*, 580 S.W.3d at 154. Under both harm standards, the charge error must have caused some actual harm, as opposed to merely theoretical harm, to the appellant. *Gonzalez v. State*, 610 S.W.3d 22, 27 (Tex. Crim. App. 2020).

Neither side has the burden to prove or disprove harm. *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013). Instead, we independently review the record. *See id.* To assess harm, we must evaluate the entire record, including the jury charge, contested issues, weight of the probative evidence, arguments of counsel, and any other relevant information. *Jordan*, 593 S.W.3d at 347. Because our

assessment of harm turns on the record as a whole, we must decide whether jury charge error was harmful on a case-by-case basis, rather than by applying bright-line rules. *Rogers v. State*, 550 S.W.3d 190, 192 (Tex. Crim. App. 2018).

**B.    Analysis**

A section of the jury charge defined key terms. Costilla's complaint concerns the definition of two of the culpable states of mind:

(1) "intentionally," which stated that a person acts with this state of mind "with respect to a result of his conduct when it is his conscious objective or desire to *engage in the conduct* or cause the result"; and

(2) "knowingly," which stated that a person acts with this state of mind "*with respect to the nature of his conduct or to the circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist*" and "with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result."

At trial, Costilla requested that the trial court "limit the culpable mental states to the result of the conduct." In other words, he requested that the trial court delete the italicized language from the preceding definitions.

The trial court denied Costilla's request.

On appeal, Costilla contends that the italicized language in the charge's definitions is erroneous because assaultive offenses are result-oriented crimes. Thus, he reasons, his state of mind as to the conduct itself and surrounding circumstances is irrelevant. Costilla argues that this error harmed him by reducing the State's burden of proof, inasmuch as it allowed the jury to find him guilty if it found that he

33

merely "engaged in the conduct or was aware of the nature of the conduct or the circumstances surrounding the conduct." He maintains the jury was entitled to find him guilty only if it found that he intended to cause bodily injury or was aware that his actions were reasonably certain to cause bodily injury.

A trial court errs when it does not limit the language concerning the culpable states of mind to the appropriate conduct element. *Price v. State*, 457 S.W.3d 437, 441 (Tex. Crim. App. 2015). Thus, when the Legislature makes an act criminal on account of its result, the jury charge must require culpability as to that result, rather than as to the commission of the act itself. *Id.* The jury found Costilla guilty of misdemeanor assault causing bodily injury—family violence, which is a result-oriented crime. PENAL § 22.01(a)(1), (b); *Price*, 457 S.W.3d at 442. Specifically, the crime cannot be committed without bodily injury. *See Price*, 457 S.W.3d at 442 (saying same as to third-degree felony version of offense). Because the gravamen of assault causing bodily injury—family violence is its result, the jury charge in a prosecution for this crime must limit the definitions of the culpable states of mind to the result, which is causing bodily injury. *Id.* at 441–43. Accordingly, we agree with Costilla that the jury charge was erroneous in failing to do so.[3]

---

[3] The definitions of "intentionally" and "knowingly" should have read: "A person acts intentionally, or with intent, with respect to a result of his conduct when it is his conscious objective or desire to cause the result. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." *Price*, 457 S.W.3d at 443.

But we disagree with Costilla's contention that this error was harmful. The jury charge as a whole, the principal contested issue at trial, the weight of the evidence, and counsel's arguments show that the error did not actually harm Costilla.

Though the jury charge's definitions of "intentionally" and "knowingly" were erroneous, the charge did not repeat the error in its application paragraphs. With respect to both continuous family violence and the lesser-included offense of assault causing bodily injury—family violence, the charge instructed that the jury was to find Costilla guilty only if it found he did "intentionally, knowingly, or recklessly cause bodily injury." This language clarified that Costilla's state of mind with respect to the result—causing bodily injury—was to be the focus of the jury's deliberations and findings.

In *Hughes v. State*, for example, the Court of Criminal Appeals addressed the same definitional error of "intentionally" and "knowingly" in the context of a murder prosecution. 897 S.W.2d 285, 294–95 (Tex. Crim. App. 1994). The Court concluded that the error did not harm the defendant because the application paragraph clarified that the jury was to find the defendant guilty only if it found that he did "intentionally or knowingly cause the death" of the victim. *Id.* at 296–97. The jury charge in *Hughes* is materially indistinguishable from the one before us in this regard.

Nor was Costilla's mental state the principal contested issue at trial. Though Costilla told Pierce that he pinned Frausto down in self-defense, the main issue

before the jury was Frausto's credibility as a witness. Frausto told two contradictory stories. On the evening of the November 12 altercation, she told Cormier that Costilla attacked her. At trial, Frausto disavowed that version of events, testifying that she had made up the allegations against Costilla to avoid being taken to jail herself. The jury had the task of deciding whether Frausto had lied on the evening of the altercation or was lying on the stand. Costilla's guilt or innocence ultimately hinged on the jury's decision as to which of Frausto's stories was true (or whether the evidence allowed it to decide this beyond a reasonable doubt).

Notably, the jury charge contained a self-defense instruction. Thus, the jury considered and rejected Costilla's claim that he acted in self-defense.

The weight of the evidence further underscores that Costilla suffered no harm from the erroneous definition of "intentionally" and "knowingly." Costilla has not challenged the legal sufficiency of the evidence as to the offense of conviction. Nor could he successfully do so. The jury viewed the recording from Cormier's body camera. As depicted in this recording, Frausto told Cormier that she tried to leave the apartment and Costilla responded by trying to tackle her. Costilla told Frausto she was not going anywhere, and he pinned her to floor. While Costilla had her pinned, he put one hand over her mouth and nose, which impeded her breathing.

The jury's verdict reflects that it found the version of events Frausto related to Cormier true beyond a reasonable doubt. The jury was entitled to find Costilla

guilty of the lesser-included misdemeanor offense of assault causing bodily injury—family violence based on this evidence alone. *See Ploeger v. State*, 189 S.W.3d 799, 810 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (complainant's testimony she feared bodily injury or death legally sufficient to satisfy element that defendant caused complainant to be under such fear in stalking prosecution); *see also Hernandez v. State*, 470 S.W.3d 862, 867–69 (Tex. App.—Fort Worth 2015, pet. ref'd) (complainant's testimony that defendant threatened him was legally sufficient evidence of threat in aggravated assault prosecution).

Finally, the parties' closing arguments underscored that Frausto's veracity was the principal contested issue. Defense counsel emphasized in closing that Frausto had been untruthful, had manipulated the responding officers and the prosecution, and was trying to manipulate the jury. For example, defense counsel argued:

> Christina is the one that's striking and hurting and attacking Drake. Drake calls the cops. What does she do? She gets out there and she manipulates Cormier right off the bat. And then what does she do? Then she manipulates the State into giving her immunity to testify. The only way she would testify [is] if she had immunity so that she can't—I can't get arrested. I can't get charged. I can't get prosecuted for lying. She manipulated them. She's manipulated everybody since she's been here.

> And if the State says she lied to them, I know she lied to me and I know she lied to you. We all know that, right? She's a liar. Why in the world would you think that she wouldn't lie to Cormier?

How can you determine, beyond a reasonable doubt, that what she told Cormier when you know for a fact that she's a dead-up liar. You know that. The State's gonna ask you to rely upon a liar and convict this man of a felony? They're gonna ask you to conclude beyond a reasonable doubt that you can rely upon a liar, beyond a reasonable doubt, to that level of certainty, the highest level of certainty we have anywhere? Because you can't blame people, you can't label people, you can't convict people on testimony like that.

Counsel for the State, in turn, conceded that she was disappointed in Frausto's courtroom behavior. The State agreed during closing that Frausto had "lied to all of us." But the State argued that Frausto's courtroom behavior was nonetheless explicable once one took into account Frausto's desire to ensure that Costilla could continue providing for their daughter financially. The State maintained that Frausto lied on the stand for their child's sake. But, the State argued, this case "isn't about what Christina wants." According to the State, Frausto had been truthful with Cormier, and her statements to Cormier showed that Costilla was guilty as charged.

On this record, we hold that the trial court's error in defining "intentionally" and "knowingly" in the jury charge did not actually harm Costilla. We therefore overrule Costilla's challenge to the charge because the error is not reversible.

## CONCLUSION

We affirm the trial court's judgment.


Gordon Goodman
Justice

Panel consists of Justices Goodman, Hightower, and Rivas-Molloy.

Publish. TEX. R. APP. P. 47.2(b).